**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YANG JUN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>500.COM LIMITED, ZHENGMING PAN, and QIANG YUAN,<br><br>Defendants. | **CASE No.: 2:20-cv-00806-SJF-SMG**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Lead Plaintiff Bryan Xuan and named plaintiff Shiyun Shao ("Plaintiffs" or "Investors), individually and on behalf of all other persons similarly situated, by Investors' undersigned attorneys, for Investors' complaint against Defendants (defined below) allege the following based upon personal knowledge as to Investors and Investors' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Investors' attorneys, which included, among other things, a review of the Defendants' public documents and announcements made by Defendants, public filings, wire and press releases published by and regarding 500.com Limited ("500.com" or the "Company"), consultation with an expert in the area of auditing public company financial statements, and information readily obtainable on the Internet. Investors believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons or entities who purchased publicly traded securities of 500.com from April 27, 2018 to December 31, 2019, inclusive (the "Class Period").[1] Investors seek to recover compensable damages caused by Defendants' violations of the federal securities laws under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant 500.com, through its subsidiaries, provides online gaming services primarily in the People's Republic of China ("PRC") and Europe. 500.com began operations in the online lottery service in 2001 through one of its consolidated affiliated entities. On November 22, 2013 500.com's ADS began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "WBAI." The Company is incorporated in the Cayman Islands and has its principal executive offices in the PRC.

3. Prior to 2015, 500.com, an online lottery pioneer in China, enjoyed its status as one of only two entities that China's Ministry of Finance authorized to provide online lottery sales in China. 500.com became profitable in 2007 but its revenues took a nosedive in 2015 when China instituted a *de facto* ban on online gambling. Since China banned on online gambling, 500.com has operated at a loss.

4. Accordingly, in order to stay in business, 500.com had to seek out avenues aside from online gambling in China to generate sales. To that end, 500.com sought to enter the highly sought after and lucrative Japanese casino market.

---

[1] Excluded from the Class are: (i) Defendants; (ii) any current or former Officers or directors of 500.com who served in such capacities during the Class Period; (iii) the Immediate Family Members of any Defendant or any current or former Officer or director of 500.com who served in such capacities during the Class Period; and (iv) any entity that any Defendant owns or controls, or owned or controlled during the Class Period; (v) any affiliates, parents, or subsidiaries of 500.com; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded persons and entities.

5. On July 27, 2017 500.com established a wholly owned subsidiary in Japan called 500.com Nihon Limited, telling investors that its principal activities are "investment holding" and that it had no substantive operations.

6. Concurrent with 500.com's establishment of its Japanese subsidiary, Japan's Prime Minister began pushing for new legislation to allow casinos to operate in Japan. As part of this legalization, casinos were required to be part of "integrated resorts" or "IR"s that feature other attractions, like hotels, shops and conference centers. The market for establishing an integrated resort was fiercely competitive, as Japan would only grant three licenses.

7. In order to obtain one of the only three available licenses to operate an integrated resort in Japan and capture a share of the $40 billion dollar market, 500.com and its executives engaged in an illegal bribery scheme. Pursuant to the illegal scheme, three 500.com employees paid a total of 12.6 million yen in bribe payments to six Japanese government officials in 2017 and 2018 in exchange for preferential treatment in connection with the Company's bid for a license to run an integrated resort in Japan.

8. Defendants' illegal bribery scheme began in August of 2017. Immediately after 500.com established its Tokyo subsidiary Nihon, it contacted a member of Japan's legislature named Tsukaka Akimoto ("Akimoto"). Importantly, Akimoto was a staunch pro-gambling advocate and was the senior government official who headed Japan's tourism ministry, the body in charge of awarding the only three available licenses to run lucrative Integrated Resorts in Japan.

9. A 500.com internal memo that the Tokyo District Public Prosecutor's Office seized outlines the bribes 500.com paid Akimoto in exchange for his help in securing a license for 500.com to run an Integrated Resort in Japan. These bribes came in the form of quadruple compensation to Akimoto for speaking at a 500.com symposium, (where 500.com's CEO also

spoke, touting 500.com's interest in building an Integrated Resort in Okinawa) elaborate trips for Akimoto and his family, and extravagant gifts. 500.com paid Akimoto approximately 7.6 million yen[2] in illegal bribe payments.

10. At the direction of Zhengming Pan, the CEO of 500.com, Zheng Xi, the executive in charge of its Japanese subsidiary Nihon, along with two 500.com consultants, physically delivered the bribe payments to Akimoto.

11. In addition to the bribe payments 500.com made to Akimoto, 500.com paid bribes to another five members of Japan's parliament in exchange for preferential treatment in connection with 500.com's pursuit of a license to run an Integrated Resort in Japan. These bribe payments totaled approximately five million yen, one million yen in illegal bribes to each of the five governmental officials.

12. Defendants' illegal bribery scheme began to unravel in December 2019, when the Special Investigation Unit of the Tokyo District Prosecutor's Office raided the homes of two of Akimoto's secretaries. Then, armed with the necessary evidence for arrests, on December 25, 2019 Tokyo prosecutors arrested Akimoto for taking bribes from 500.com. Akimoto's arrest shocked members of the public: he was the first Japanese government official to be arrested in almost a decade. That same day, Tokyo Prosecutors also arrested Zheng Xi, the executive in charge of 500.com's Nihon subsidiary, and the two 500.com consultants.

13. Tokyo Prosecutors also arrested the five other Japanese government officials that 500.com bribed.

---

[2] In 2017 the average exchange rate was 1 dollar = 112.15 Yen. https://www.macrotrends.net/2550/dollar-yen-exchange-rate-historical-chart

14. While Akimoto maintained his innocence, one of the Japanese government officials- a man named Mikio Shimoji- admitted that during his election campaign a 500.com consultant visited his office and handed him an envelope containing 1 million yen in cash.

15. On December 31, 2019 500.com shocked the market when it announced that its Board of Directors was forming a Special Investigation Committee ("SIC") to perform an in-house probe of the bribery scheme. The Board of Directors asked CEO Defendant Pan to temporarily step aside so the SIC could investigate his role in the illegal bribery scheme. 500.com's Chairman, Xudong Chen also resigned the same day. The news of this major shakeup at the Company caused shares of 500.com to fall over 10%, or $0.91 per share, damaging investors.

16. On February 2, 2020 500.com announced that Defendant Pan officially resigned.

17. The Judge presiding over the bribery case ultimately sentenced the two 500.com consultants who paid the bribes to two years of jail time.

18. Tokyo Prosecutors also charged the CEO of 500.com's business partner in connection with the IR bid, Kihimto Kamori, with illegally paying bribes to government officials to secure preferential treatment in connection with 500.com's bid for an IR license. The Judge presiding over the bribery case convicted Kamori and sentenced him to ten months in prison. Kamori confessed to what he described as a "vicious crime that significantly damaged confidence in IR policy." Kamori further stated that 500.com gave him specific instructions to pay the bribes and that he was in a "subordinate position," paying bribes at 500.com's direction.

19. Then, on September 28, 2020 500.com disclosed that its independent auditor, Friedman LLP ("Friedman") had resigned because of it "disagree[d] with management of the Company on the effectiveness of the Company's internal control over financial reporting in light of certain alleged unlawful payments ("Payments") by three former consultants while they were

engaged by the Company in connection with the potential development of an integrated resort casino project in Japan."

20. 500.com further informed investors that the law firm the Company hired to conduct an internal investigation had completed a substantial portion of the investigation and that "after considering [the law firm's findings]" the SIC "did not identify any violation of the US Foreign Corrupt Practices Act of 1977 by the Company in connection with the Payments or the Company's prior activities in Japan." 500.com informed Friedman of this finding, prompting Friedman to resign.

21. 500.com's disclosure of Friedman's resignation highlights the self-serving nature of the Company's internal investigation. Despite informing Friedman that the SIC had not found any legal violations, Friedman "***determined that the Payments may have reflected material weaknesses in relation to the internal control of the Company***."

22. Friedman not only withdrew its opinions concerning the effectiveness of 500.com's internal controls, Friedman took the drastic step of withdrawing its clean audit reports of the Company's Class Period consolidated financial statements. This shows Friedman's belief that the illegal payments rendered 500.com's financial statements unreliable.

23. In its September 28, 2020 6-K 500.com was forced to disclose that Friedman resigned, and was withdrawing its audit reports because at the time Friedman issued its clean audit reports it was unaware of the illegal bribe payments. 500.com stated in its 6-K: "Friedman further advised us on September 23, 2020 that because some of the Payments had occurred in 2017 and 2018, ***the allegedly unlawful purpose of which was not known to Friedman at the date of the audit reports relating to the Company's consolidated financial statements for the years ended December 31, 2017 and 2018… the integrated audit reports issued by Friedman on the***

***Company's consolidated financial statements for the fiscal years ended December 31, 2017 and 2018 should no longer be relied upon.***"

24. Because Friedman resigned and retracted its 2017 and 2018 audit reports, 500.com was forced to engage a new auditor to re-audit its consolidated financial statements and the effectiveness of its internal control over financial reporting for the 2017 and 2018 fiscal years.

25. Despite their awareness of the illegal bribery scheme and their knowing failure to inform Friedman of this fraud, Defendants falsely assured investors they had, as legally required, disclosed to Friedman "any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

26. Despite their awareness that a 500.com director and two 500.com consultants were using Company funds to pay illegal bribes, Defendants Pan and Yuan attested to the integrity of the Company's internal control over financial reporting, informing investors that they were responsible for establishing and maintaining internal control over financial reporting and assuring investors that they had designed the internal controls to provide reasonable assurance regarding the reliability of the Company's financial reporting and preparation of the Company's financial statements in accordance with generally accepted accounting principles ("GAAP").

27. Additionally, despite Defendants' illegal bribery scheme Defendants assured investors that the Company had in place a Code of Business Conduct and Ethics that required all Company officers, employees and consultants to comply with all laws, including those covering bribery, kickbacks and foreign corrupt practices.

28. Further, 500.com's risk disclosures in its Class Period 20-F's set forth a litany of specific risks related to "obtaining new licenses or permits" for its gaming business. Conspicuously absent from these risks disclosures was any mention of the risks related to the

Company having engaged in illegal bribery with Japanese government officials in order to secure a license to operate an IR in Japan.

29. As to 500.com's Japanese subsidiary, Nihon, Defendants told investors that its principal activity was investment holding and that it had no substantive operations. In truth, Nihon and the executive in charge of it engaged in an illegal bribery scheme designed to secure a license for the Company to run a lucrative Integrated Resort in Japan.

## JURISDICTION AND VENUE

30. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

32. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

33. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

34. Lead Plaintiff Bryan Xuan purchased 500.com ADS at artificially inflated prices during the Class Period and has been damaged thereby. His PSLRA certification was previously filed with this Court. (Dkt. No. 6-5) and is incorporated by reference herein.

35. Named Plaintiff Shiyun Shao purchased 500.com ADS at artificially inflated prices during the Class Period and has been damaged thereby. Her PSLRA certification is attached hereto and is incorporated by reference herein.

36. Defendant 500.com, through its subsidiaries, purports to provide online gaming services primarily in the People's Republic of China and Europe. 500.com began operations in the online lottery service industry in 2001 through one of its consolidated affiliated entities. On November 22, 2013 its ADS began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "WBAI." The Company is incorporated in the Cayman Islands and its principal executive office is located at 12F, West Side, Block B, Building No. 7, Shenzhen 518115, The People's Republic of China.

37. Defendant Zhengming Pan ("Pan") served at the Company's President since September 1, 2014 and chief financial officer and director from April 2011 to August 2014. On May 15, 2015 Pan was appointed the Company's Chief Executive Officer ("CEO"), and remained CEO throughout the Class Period.

38. Defendant Qiang Yuan ("Yuan") has served as the Company's Chief Financial Officer ("CFO") since December 18, 2017. Prior to his appointment as CFO Yuan served in various positions within the Company since 2001.

39. Defendants Pan and Yuan are collectively referred to herein as the "Individual Defendants."

40. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

41. 500.com is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

42. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to 500.com under *respondeat superior* and agency principles.

43. Defendants 500.com and the Individual Defendants are collectively referred to herein as "Defendants."

**RELEVANT NON-PARTIES**

44. Tsukasa Akimoto ("Akimoto") is a Japanese government official. Akimoto is a member of Japan's Liberal Democratic Party and a member of the House of Councillors in the Diet (Japan's national legislature). During the Class Period, Akimoto, a pro-gambling advocate,

was a senior official at Japan's Tourism Ministry who oversaw efforts to develop the casino industry in Japan. On December 25, 2019 Tokyo prosecutors arrested and charged Akimoto with illegally taking bribes from 500.com.

45. Takeshi Iwaya ("Iwaya") is a Japanese government official. Iwaya is a member of Japan's Liberal Democratic Party and a member of the House of Representatives in the Diet. Iwaya served as the Minister of Defense to Japan's Prime Minister Shinzo Abe from October 2, 2018 to September 11, 2019. Iwaya was also a member of a cross-party group of Japanese lawmakers who advocated promoting Integrated Resorts. In December 2019 Tokyo Prosecutors charged an executive at 500.com's Nihon subsidiary and two 500.com consultants with paying Iwaya 1 million yen in illegal bribes in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan.

46. Toshimitsu Funahashi ("Funahashi") is a Japanese government official. Funahashi is a member of Japan's Liberal Democratic Party. In December 2019 Tokyo Prosecutors charged 500.com executives with paying Funahashi 1 million yen[3] in illegal bribes in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan.

47. Hiroyuki Nakamura ("Nakamura") is a Japanese government official. Nakamura is a member Japan's Liberal Democratic Party and a member of the Committee on Land, Infrastructure, Transport and Tourism. In December 2019 Tokyo Prosecutors charged an executive at 500.com's Nihon subsidiary and two 500.com consultants with paying Nakamura 1 million yen in illegal bribes in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan.

---

[3] In 2017 the average exchange rate was 1 dollar = 112.15 Yen. https://www.macrotrends.net/2550/dollar-yen-exchange-rate-historical-chart

48. Masahisa Miyazaki ("Miyazaki") is a Japanese government official. Miyazaki is a member of Japan's Liberal Democratic Party and legal advisor to the Okinawa Prefecture, the location where 500.com sought to run an Integrated Resort. In December 2019 Tokyo Prosecutors charged an executive at 500.com's Nihon subsidiary and two 500.com consultants with paying Miyazaki 1 million yen in illegal bribes in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan.

49. Mikio Shimoji ("Shimoji") is a Japanese government official. Shimoji is a member of Japan's Innovation Party (Nippon Ishin). On January 6, 2020 Shimoji confessed that 500.com illegally paid him 1 million yen on October 17, 2019. On January 7, 2020 Shimoji submitted his resignation to the Innovation Party.

50. Zheng Xi ("Xi") is a former executive director of 500.com's Nihon subsidiary. Tokyo prosecutors arrested Xi on December 25, 2019 for paying illegal bribes to Japanese government officials in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan.

51. Masahiko Konno ("Konno") is a former employee of 500.com. Tokyo prosecutors arrested Konno on December 25, 2019 for paying illegal bribes to Japanese government officials in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan. Konno was convicted of bribing government officials on behalf of 500.com and sentenced to two years in prison.

52. Katsunori Nakazato ("Nakazato") is a former employee of 500.com. Tokyo prosecutors arrested Nakazato on December 25, 2019 for paying illegal bribes to Japanese government officials in exchange for preferential treatment in connection with 500.com's bid for a license to run an Integrated Resort in Japan. Nakasoto admitted to Tokyo prosecutors that, at

500.com's direction, he delivered a total of 8 million yen in bribe payments to six Japanese government officials in September 2017. Nakazato was convicted of bribing government officials on behalf of 500.com and sentenced to twenty-two months in prison.

53. Kamori Kanko ("Kamori") is a tourism and hospitality company located in Japan. Kihimoto Kamori is the CEO of Kamori Kanko. 500.com partnered with Kamori Kanko in connection with its plans to run an Integrated Resort in Japan. On September 29, 2020 a Japanese court convicted Kihimoto Kamori of illegally bribing government officials to secure preferential treatment in connection with 500.com's bid for an IR license. The court sentenced Kihimoto Kamori to ten months in prison. Kihimoto Kamori confessed to the crime, and stated that he was in a subordinate position whereby 500.com specifically instructed him to carry out all actions in connection with the illegal bribery.

## ALLEGATIONS OF MISCONDUCT

### 500.com's Business

54. 500.com is an online lottery pioneer in China. The Company was among the first to provide online lottery services in China. The Company is one of only two entities that China's Ministry of Finance authorized to provide online lottery sales on behalf of the China Sports Lottery Administration Center, the government authority in charge of issuing and selling sports lottery products in China.

55. 500.com first began operating a gambling website in 2001. The Company became profitable in 2007 and went public on November 22, 2013, when its ADS began trading on the New York Stock Exchange under the ticker symbol WBAI.

56. 500.com's troubles began in January 2015 when the Chinese government enacted a *de facto* ban on online gambling. Accordingly, 500.com suspended all of its online lottery sales on April 5, 2015.

57. Because of China's *de facto* ban on online gambling, 500.com has not turned a profit for over five years, since 2015.

58. Indeed, prior to and during the Class Period, 500.com operated at a loss. For the 2019 fiscal year 500.com reported a net loss of 451.7 million yuan, or $64.5 million.

59. Prior to and during the Class Period the Company stated that "it does not expect to issue an earnings forecast until it receives clear instructions as to the resumption date of online sports lottery sales from the Ministry of Finance."

60. Given the Company's inability to generate revenue through online gambling in China, Defendant Pan promised shareholders that 500.com would seek to generate revenue through other means. As Pan stated in the Company's February 20, 2019 6-K, "[s]ince we voluntarily suspended our online lottery sales operations in April 2015, we have continued to engage in new and promising initiatives to increase our revenue base."

61. To generate revenue through means other than online gambling in China, 500.com sought to enter the highly sought after and enormously lucrative Japanese casino market.

62. Accordingly, on July 27, 2017 500.com established a wholly owned subsidiary in Japan called 500.com Nihon Limited ("Nihon" or "500.com JP"). 500.com stated that Nihon's principle activities are "investment holding," and told investors that Nihon had no substantive operations.

63. Concurrent with 500.com establishing Nihon, in 2017, Japan's Prime Minister Shinzo Abe began pushing for new legislation to allow casinos to operate in Japan.

64. In July of 2018 Abe's efforts were successful and casinos were allowed to operate in Japan.

65. While Japan legalized some forms of gambling in 2016 in order to stimulate Japan's sluggish economy, Abe's July 2018 legislation would for the first time allow blackjack, roulette and other game tables to operate in Japan.

66. This opened up a potentially enormous new market for casino operators. Analysts estimated that Japan's newly legalized casino market could be worth as much as *$40 billion*, and rival Macau as Asia's gambling capital.

67. As part of the legalization, casinos were required to be part of "integrated resorts" or "IR's" that featured other attractions, like hotels, shops and conference centers.

68. The market for establishing an integrated resort was fiercely competitive, as Japan would only grant three licenses.

**Defendants' Illegal Bribery Scheme**

69. In order to obtain one of the only three available licenses to operate an integrated resort in Japan and capture a share of the $40 billion dollar market, 500.com and its executives engaged in an illegal bribery scheme. Pursuant to the illegal scheme, a 500.com executive and two 500.com consultants paid a total of 12.6 million yen in bribe payments to six Japanese government officials in 2017 and 2018 in exchange for preferential treatment in connection with the Company's bid for a license to run an Integrated Resort in Japan.

70. In late December 2019 the Tokyo District Public Prosecutor's Office filed documents in the Tokyo District Court detailing 500.com's plan to pay illegal bribes to six members of the Japanese legislature in exchange for preferential treatment in connection with

500.com's bid for a license to run an Integrated Resort in Japan. Japan's Political Funds Control Law prohibits foreign companies from making donations to political organizations.

71. The Tokyo Prosecutor's court filings outline 500.com's scheme to illegally secure the help of Japanese government officials in connection with its plans to build a casino on the northern island of Hokkaido in Japan.

72. The Tokyo Prosecution based its case, in part, on a 500.com internal memo. The 500.com internal memo revealed that 500.com paid 1 million yen to each of five Japanese government officials (all lower house representatives) for a total of 5 million yen in bribes, in exchange for preferential treatment in connection with 500.com's bid. This five million yen in illegal bribe payments is in addition to the approximately 7.6 million yen in illegal bribe payments 500.com paid to Japan's senior vice minister of tourism, Tsukaka Akimoto.

73. In connection with the Tokyo Prosecution's case, on December 23, 2019 Tokyo prosecutors arrested three 500.com employees: Zheng Xi, Masahiko Konno and Katsunori Nakazato. Prosecutors also arrested Japanese parliament member and Senior Vice Minister of tourism, Tsukaka Akimoto.

74. One of the three 500.com employees who paid the illegal bribes, Katsunori Nakasoto, admitted to Japanese prosecutors that he delivered 1 million yen in bribe payments to each of five Japanese government officials in around September 2017. The five Japanese government officials: Hiroyuki Nakamura, Takeshi Iwaya, Toshimitsu Funahashi, Mikio Shimijo and Masahisa Miyazaki, were all members of the Diet's lower house at the time 500.com paid them bribes.

75. Nakasoto additionally admitted that in September 2017 he handed 3 million yen in a cash bribe payment to Akimoto, a member of Japan's diet and a senior government official at

Japan's tourism ministry who oversaw Japan's efforts to develop the casino industry. Nakasoto paid the bribe monies in order to secure favorable treatment for 500.com in connection with its bid for a license to run an Integrated Resort in Japan.

76. 500.com began its illegal bribery scheme in August of 2017, immediately after it established Nihon.

77. Immediately after 500.com established Nihon, 500.com contacted Japanese lawmaker Akimoto. Akimoto was then a member of the lower house of Japan's Parliament, called the "Diet." Akimoto was also a staunch pro-gambling advocate. He was in charge of the government's policy on new casinos as a senior vice minister in Japanese President Shinzo Abe's cabinet.

78. On August 4, 2017 500.com held a symposium on integrated resorts in Naha, Okinawa, Japan. Defendant Pan spoke at the symposium. There, Pan revealed his interest in investing in a prospective Integrated Resort in Okinawa. Pan responded to a question concerning his interest in the project in light of the governor's opposition to casino development stating, "we need a debate about the reasons for the opposition. We can bring cutting edge technology to the Japan IR business and the issue of gambling addiction through the use of big data and artificial intelligence." Pan also stated that 500.com's investment in the integrated resort would be approximately $2.5 billion.

79. Akimoto served as the keynote speaker at 500.com's symposium in Naha. 500.com initially promised Akimoto a speaking fee of 500 million yen. However, several days after 500.com's symposium, 500.com learned that Akimoto would become state minister at the Cabinet Office and the land ministry and that he would be in charge of all matters related to Integrated Resorts.

80. Immediately after learning of Akimoto's position of power in relation to Integrated Resorts, 500.com quadrupled Akimoto's compensation for speaking at the symposium to 2 million yen. 500.com paid Akimoto this fee with the expectation that he would provide illegal favors for 500.com's bid to enter the casino business in Japan.

81. Then, on September 28, 2017, 500.com employee Masahaki Konno withdrew $207,000 in cash from a 500.com Hong Kong bank account. Konno then flew from Hong Kong to Japan through Kansai International Airport. Konno did not declare the funds, in violation of Japanese custom laws. Japan's Diet was dissolved that day ahead of general elections.

82. Upon arriving in Japan that day, Konno, along with his 500.com colleague Katsunori Nakazato, visited Akimoto at his House of Representatives office building in Tokyo and handed Akimoto 3 million yen in cash. The payment was an illegal bribe in exchange for Akimoto's assistance in 500.com's bid to run an Integrated Resort.

83. Later that same day, Nakazato delivered bribes of 1 million yen each to five other lawmakers: Takeshi Iwaya, Toshimitsu Funahashi, Hiroyuki Nakamura, Masahisa Miyazaki of the ruling Liberal Democratic Party, and Mikio Shimojo of the Osaka-based Japan Innovation Party. Each of these payments were illegal bribes in exchange for assistance in 500.com's bid for a license to run an Integrated Resort.

84. From December 27, 2017 through December 29, 2017 Akimoto and two of his junior ruling party colleagues, Takai Shirasuka and Shigeaki Katsunama, visited 500.com's headquarters in Shenzen, China. 500.com flew them to its headquarters via a private jet that 500.com paid for. 500.com then arranged and paid for Akimoto to take a trip to Macau to tour an Integrated Resort. Akimoto's expenses for the trip totaled 1.5 million yen. During the trip to

Macau 500.com even bought Akimoto expensive luxury gifts such as designer brand shoes and an expensive bag.

85. Akimoto lied about the fact that he reimbursed 500.com for his expenses. In truth, 500.com's payment of Akimoto's expenses were illegal bribes. And, according to Tokyo prosecutors, 500.com issued fake receipts to Akimoto to cover up the fact that 500.com had paid all of his expenses in connection with the two trips.

86. In January 2018 top executives at 500.com and its potential Japanese partner, Kamori Kanko, met with government officials of Rusutsu village, Hokkaido Japan about their proposal to seek an Integrated Resort license within the municipality. Defendant Pan then held a press conference, stating "Rusutu village is the place for a new resort making use of the natural environment."

87. Then, in February 2018, 500.com paid Akimoto additional bribe monies, this time in the form of 760,000 yen in expenses for Akimoto's family trip to Hokkaido, where 500.com planned to build its Integrated Resort. There, Akimoto met with officials of Rusutu village in an effort to demonstrate that 500.com's Integrated Resort project had the support of Japan's central government. After this meeting, Akimoto met with the Transport Ministry department in charge of airport construction where he inquired about building a small airport at Rusutu to accommodate wealthy travelers with private jets who would visit 500.com's anticipated Integrated Resort. Akimoto took the meeting after 500.com's business partner in the IR project, Kamori Kanko, requested that he do so. Kamori's CEO, Kihimoto Kimoro admitted that he "accepted intrusive information regarding IR-related bills from [Akimoto]", and, at 500.com's behest provided the most expensive hotel room, round-trip transportation and entertainment for Akimoto and his family on the trip to Rusutu.

88. In July 2018 Defendant Pan visited Okinawa, renewing his pitch to build a resort in the prefecture. Pan brought along his potential partner, Kevin McGowen, CEO of *Les Ambassadeurs* Club in London.

89. On July 20, 2018, the Diet passed the IR Implementation Act, with the support of the ruling Liberal Democratic Party and the Japan Innovation Party. Passage of the Act brought 500.com one step closer to its goal of obtaining a license to build a lucrative Integrated Resort in Japan.

**500.com's Illegal Bribery Scheme Unravels**

90. On December 7 and 8, 2019 the Special Investigation Unit of the Tokyo District Public Prosecutors office raided the homes of two of Akimoto's former secretaries.

91. The Japanese news media did not report the raids immediately, and on December 9, 2019 Akimoto told Japanese journalists that the raids had nothing to do with him.

92. On December 17, 2019 the Japanese news media reported on the raids of Akimoto's assistants' homes. Tokyo prosecutors leaked that the investigation was in connection with excessive amounts of cash being brought into Japan without notifying customs in advance, in violation of the Foreign Exchange and Foreign Trade Act. Prosecutors stated that the raids were connected to a Shenzen-based company interested in the Japanese integrated resorts market but refused to name the company.

93. On December 19, 2019 Tokyo prosecutors raided two of Akimoto's offices in Tokyo. That same day, Akimoto denied illegal conduct in a post on Twitter, writing "I've never been involved in a fraudulent act. I'll argue that point at any cost."

94. On December 25, 2019 Tokyo prosecutors arrested Akimoto on suspicion of taking $33,800 in bribes. The prosecutor's first indictment alleges that 500.com paid Akimoto 3 million

yen in cash on September 28, 2017 along with 700,000 yen in expenses for his trip to Hokkaido. Akimoto was the first lawmaker in Japan to be arrested in almost a decade. That same day, Akimoto announced his intention to resign from Japan's ruling Liberal Democratic Party.

95. Also on December 25, 2019, Tokyo prosecutors arrested three employees of 500.com: Zheng Xi, the director in charge of 500.com's Nihon subsidiary and Konno and Nakazato.

96. On December 31, 2019 500.com, announced that the Company's Board of Directors were forming the SIC ato conduct an in-house probe of the bribery scheme. The Company's chairman, Xudong Chen resigned the previous day amidst allegations of the illegal bribery scheme. The Company also announced that Defendant Pan would "temporarily step aside" to allow the Company's new Special Investigation Committee to conduct its own in-house probe of the bribery scheme.

97. Tokyo prosecutors indicted Akimoto twice: first on December 25, 2019 and then again in January 2020. The prosecutor's first indictment alleges that 500.com paid Akimoto 3 million yen in cash on September 28, 2017 along with 700,000 yen in expenses for his trip to Hokkaido. The prosecutor's second indictment alleges that 500.com paid Akimoto an additional 2 million yen in bribe payments and 1.5 million yen in travel expenses. Accordingly, Japanese prosecutors allege that 500.com paid Akimoto a total of 7.6 million yen in cash and other gifts, all of which constituted illegal bribe payments, between 2017 and 2018.

98. Akimoto was released on February 12, 2020 after a month and a half in custody after he paid $273,000 in bail. However, prosecutors appealed the court's decision to grant Akimoto's bail and he will not be re-released until the court decides the appeal.

99. While Akimoto denied taking bribes from 500.com he admitted that he visited 500.com's headquarters in 2017 and that 500.com paid his expenses in connection with his trip in the amount of 1.5 million yen.

100. Mikio Shimoji, one of five other Japanese government officials that prosecutors charged with taking illegal bribes from 500.com was the first to admit that he received cash bribes from 500.com. Shimoji was a strong proponent of introducing Integrated Resort projects in Japan.

101. On January 6, 2020, Shimoji spoke at a press conference and admitted that 500.com gave his office 1 million yen for 2017 general election campaigning.

102. Shimoji admitted that 500.com employee Masahiko Konno delivered the bribe money to his campaign office. Konno visited Shimoji's campaign office in Naha, Japan on around October 15, 2017, during Shimoji's Lower House election campaign. Konno handed Shimoji's staff member an envelope containing 1 million yen.

103. On January 16, 2020 500.com announced that it retained law firm King & Wood Mallesons as legal adviser to assist with its internal investigation.

104. Given 500.com's flagrant bribes to numerous Japanese government officials, at a January 20, 2020 Diet Session, opposition parties submitted a bill that would reverse the legalization of casino gambling. That day, the Abe government announced that it would delay passing its "IR Basic Plan," the legislation laying out the requirements and processes to make bids for integrated resort licenses.

105. On February 2, 2020, 500.com announced that Defendant Pan had resigned from the Company entirely. Defendant Pan resigned one month after he temporarily stepped down so that the Company's SIC could investigate his role in the bribery scheme. Pan's permanent

resignation from the Company confirmed to 500.com investors his participation in the illegal bribery scheme.

106. On October 13, 2020 Japanese news outlets reported that the judge presiding over the bribery case sentenced Nakazato and Konno to jail time. Konno was sentenced to two years in prison and Nakazato to twenty-two months. Commenting on the case Judge Toshihiko Niwa stated, "A large amount of the money was provided and blatant hospitality…the fairness of their public duty with regard to IR and the trust of the general public were significantly damaged." In sentencing Nakazato and Konno Judge Niwa rejected the defense argument that because 500.com had not realized its goal of participating in the IR bid it had not caused actual harm from the illegal bribery.

107. Prosecutors also charged 500.com's business partner in connection with the IR project with illegally paying bribes to government officials to secure preferential treatment in connection with 500.com's bid for an IR license. On September 28, 2020 Japanese news outlets reported that the chairman of Kamori Kanko, Kihimoto Kamori was found guilty of bribery and sentenced to ten months in prison. Kamori was specifically charged with conspiracy to supply travel expenses for Akimoto's trip to Hokkaido. Indeed, Kamori admitted to participating in efforts to bribe Akimoto on behalf of 500.com. In a statement to the Tokyo District Court Kamori confessed, "I enthusiastically made an appeal to attract IR to Rusutsu village, Hokkaido, and was actively involved in the crime. It was a vicious crime that significantly damaged confidence in IR policy." Kamori also stated that he was in a subordinate position and received instructions from 500.com representatives in carrying out all actions in connection with the illegal bribery. In sentencing Kamori Judge Niwa stated "While [Akimoto] was serving as Senior Vice Minister [Kamori] not only provided transportation for Akimoto and his family, he also provided all-

expenses-paid special treatment in terms of entertainment and all aspects of the trip. [Kamori] had the intent of bribery and financed it."

108. Despite the confessions, prison sentences and mountain of direct evidence that 500.com intentionally paid illegal bribes to government officials, 500.com has refused to admit itsillegal conduct.

109. On October 7, 2020 500.com informed investors that the SIC had completed its internal investigation. In its 6-K filed with the SEC 500.com stated "KWM [law firm King, Wood & Mallesons] presented its investigation review to SIC on October 7, 2020. Based on the findings and analyses in KWM's review, ***the SIC has concluded*** that it did not find a sufficient basis to establish a violation of the US Foreign Corrupt Practices Act of 1977 in connection with the Company's prior activities in Japan.

110. The fact 500.com was unable to represent that the law firm it hired to assist with the internal investigation found no legal violation is a major red flag demonstrating that the SIC's investigation was a sham. Unlike the neutral law firm KWM, The SIC is comprised of 500.com board members, not independent attorneys. Defendants have not made public the "findings and analyses" in KWM's review, only their own self-serving conclusion that the SIC did not find a "sufficient basis" to establish an FCPA violation.

**Defendants Hid the Illegal Bribery from 500.com's Independent Auditor Prompting it to Resign and Retract its Reports Contained in 500.com's Class Period 20-F's**

***a. Relevant Auditing Standards***

111. The Private Securities Litigation Reform Act ("PSLRA") sets forth the requirements for independent audits of a company's financial statements in accordance with generally accepted auditing standards. 15 U.S.C. 78j-1 "Audit Requirements"

112. The PSLRA states that a registered public accounting firm (i.e. auditor) conducting an audit of a company's financial statements shall include "procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts" 15 USC 78j-1(a)(1).

113. The PSLRA further provides that if, in the course of conducting an audit, the auditor detects or *otherwise becomes aware of* information indicating that an illegal act (whether or not perceived to have a material effect on the financial statements of the issuer) has or may have occurred, the auditor shall determine whether it is likely that an illegal act has occurred. 15 U.S.C. 78j-1(A)(i).

114. If the auditor determines that an illegal act has occurred it must: 1) determine and consider the possible effect of the illegal act on the company's financial statements and 2) inform the company's management as soon as practicable and assure that the audit committee of the company's board of directors is informed of the illegal act(s) unless the illegal act(s) is/are clearly inconsequential. 15 U.S.C. 78j-1 (A)(ii); (B).

115. The PSLRA further provides that, if, after determining that the audit committee of the company's board of directors has been informed of the illegal act(s) the auditor concludes that: a) the illegal act has a material effect on the company's financial statements; b) the company's board of directors has not caused senior management to take appropriate remedial actions with respect to the illegal act; and c) the failure to take remedial action is reasonably expected to warrant departure from a standard report of the auditor or warrant the auditor to resign from the audit engagement; the auditor must report such conclusions to the company's board of directors as soon as practicable. 15 U.S.C. 78j-1 (2)(A)-(C).

116. After a company receives a report from its auditor containing such conclusions it must notify the SEC and provide the auditor with a copy of such notice to the SEC. 15 U.S.C. 78j-1 (3). If the Company does not inform the SEC of the auditor's conclusions concerning such illegal acts the auditor must either: 1) resign or 2) provide the SEC with a copy of its report (or the documentation of any oral report) concerning the company's illegal acts. 15 U.S.C. 78j-1 (3)(A)(B). If an auditor resigns because of a company's failure to notify the SEC of the auditor's conclusions concerning the company's illegal acts the auditor must provide the SEC with a copy of the report it gave to the company or the documentation of any oral report it gave to the company. 15 U.S.C. 78j-1 (4).

117. The Auditing Standards ("AS") promulgated by the Public Company Accounting Oversight Board ("PCAOB") likewise contain procedures governing an auditor's discovery of facts subsequent to issuing its audit report that existed at the time of the report. *See* AS 2905 *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report.* ("AS 2905").

118. Pursuant to AS 2905 when an auditor becomes aware of information relating to the financial statements the auditor reported on that was not known to him at the date of his audit report and which is of such a nature and from such a source that he would have investigated it had it come to his attention during the course of his audit he should, as soon as practicable, determine whether the information is reliable and whether the facts existed at the time of his audit report. The auditor should discuss this information with management and request management's cooperation in whatever investigation may be necessary. AS 2905.04.

119. When the auditor determines that the subsequently discovered information is both reliable and existed at the date of the auditor's report, the auditor should take further action if the nature and effect of the matter are such that: a) his report would have been affected had he been

aware of the information at the date of his report and such information was not reflected in the financial statements and b) the auditor believes that there are persons relying on or likely to rely on the financial statements who would attach importance to the information. AS 2902.05

120. When the auditor has concluded that action should be taken to prevent future reliance on his report, he should advise his client to appropriately disclose the newly discovered facts and their impact on the financial statements. The client's method of disclosure will depend on the circumstances. AS 2905.06

121. To that end, there are several types of disclosures a company may make when its auditor determines that reliable, newly discovered information would have impacted the company's financial statements and the auditor's report. AS 2905.06 a-c.

122. If the company can promptly determine the effect of the subsequent information on the financial statements or auditor's report, the disclosure should consist of issuing, as soon as practicable, revised financial statements and a revised auditor's report, and the notes to the financial statements should contain a note describing the revision. AS 2905.06 a.

123. If the company's issuance of financial statements accompanied by the auditor's report for a subsequent period is imminent, the company can make appropriate corrective disclosures in the forthcoming financial statements instead of reissuing the earlier statements. AS 2905.06 b.

124. When the Company is unable to determine the effect on the financial statements of the subsequently discovered information without a prolonged investigation, the issuance of revised financial statements and auditor's report will necessarily be delayed. In this circumstance, when it is likely that the information will require the company to issue revised financial statements the company must notify those relying on the financial statements and the auditor's report that they

should no longer rely on the financial statements and the auditor's report, and that the company will issue revised financial statements accompanied by a report from its auditor when the investigation is completed. AS 2905.06 c.

125. The auditor should take whatever steps necessary to satisfy himself that the client has made appropriate disclosures concerning the subsequent information. AS 2905.07.

***b. Friedman's Audit Reports***

126. On February 9, 2018 500.com appointed Friedman LLP as its independent auditor to conduct the audit of its financial statements and review the effectiveness of the Company's internal control over financial reporting.

127. 500.com's management is responsible for the Company's financial statements, for maintaining effective internal control over financial reporting and for assessing the effectiveness of internal control over financial reporting.

128. 500.com based its assessment of the effectiveness of its internal control over financial reporting using *Internal Control- Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission* (the "COSO Framework"). The COSO Framework requires an organization to have five specific internal control components in order to have effective internal controls. One of these components is a "control environment, present and functioning." A necessary element of the control environment requires an organization to demonstrate a commitment to integrity and ethical values. Specifically, this requires setting a proper "tone at the top" of the organization, establishing standards of conduct, evaluating adherence to the standards of conduct and addressing deviations from the standards of conduct in a timely manner.

129. Additionally, Section 302 of the Sarbanes Oxley Act of 2002 ("SOX") requires 500.com's CEO and CFO to submit sworn certifications to investors annexed to 500.com's Form 20-F's filed with the SEC attesting to the fact that they had disclosed to Friedman "any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

130. Friedman's job is to express an opinion on the Company's financial statements and internal control over financial reporting based upon the information 500.com's management provides it.

131. Friedman audited 500.com's financial statements contained in 500.com's 2017 and 2018 20-F's filed with the SEC for the fiscal years ended December 31, 2017 and December 31, 2018, respectively. Friedman also audited 500.com's internal control over financial reporting for those years.

132. In connection with 500.com's 2017 and 2018 20-F's Defendants Pan and Yuan both signed certifications pursuant to SOX representing to investors that they had disclosed any fraud to Friedman. Pan's and Yuan's SOX certifications also promised investors that they had disclosed to Friedman any material weaknesses in 500.com's internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial information.

133. 500.com's 2017 20-F filed with the SEC on April 27, 2018 contained Friedman's report in which Friedman expressed the opinion that, for the fiscal year ended December 31, 2017: 1) 500.com's financial statements present fairly, in all material respects the Company's financial position and 2) 500.com maintained effective internal control over financial reporting. Friedman's report stated, in part:

We have audited the accompanying consolidated balance sheet of 500.com Limited and Subsidiaries (collectively, the "Company") as of December 31, 2017, and the related consolidated statements of comprehensive loss, changes in shareholders' equity, and cash flows for the year then ended, and the related notes (collectively referred to as the "financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2017 based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.

**Basis for Opinion**

***The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's financial statements and an opinion on the Company's internal control over financial reporting based on our audits.*** We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

(emphasis in original)

134. 500.com's 2018 20-F filed with the SEC on April 22, 2019 contained Friedman's report in which Friedman expressed the opinion that, for the fiscal year ended December 31, 2018: 1) 500.com's financial statements present fairly, in all material respects the Company's financial

position and 2) 500.com maintained effective internal control over financial reporting. Friedman's report stated, in part:

> Opinions on the Financial Statements and Internal Control over Financial Reporting
>
> We have audited the accompanying consolidated balance sheet of 500.com Limited and Subsidiaries (collectively, the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of comprehensive loss, changes in shareholders' equity, and cash flows for each of the two years in the period ended December 31, 2018, and the related notes (collectively referred to as the "financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018 based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.
>
> **Basis for Opinion**
>
> ***The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's financial statements and an opinion on the Company's internal control over financial reporting based on our audits.*** We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.
>
> We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

***c. Friedman's Withdrawal***

135. In truth, Defendants intentionally hid the illegal bribery scheme from Friedman.

136. On September 28, 2020 500.com filed a 6-K with the SEC informing investors that Friedman had resigned as the Company's auditor because of "the disagreement with management of the Company on the effectiveness of the Company's internal control over financial reporting in light of certain alleged unlawful payments ("Payments") by three former consultants while they were engaged by the Company in connection with the potential development of an integrated resort casino project in Japan."

137. 500.com further informed investors that the Company's SIC found that the Company did not violate the FCPA in connection with the Payments of the Company's "prior activities in Japan." 500.com informed Friedman of this finding, prompting Friedman to resign.

138. Friedman's resignation highlights the self-serving nature of the Company's internal investigation. 500.com informed investors that despite informing Friedman that the SIC had not found any legal violations, Freidman "determined that the Payments may have reflected material weaknesses in relation to the internal control of the Company."

139. Friedman's resignation demonstrates that contrary to Defendant Pan's and Yuan's SOX certifications they did not inform the Company's auditor of "any fraud" as required.

140. Friedman not only resigned as the Company's auditor and withdrew its opinion concerning the effectiveness of 500.com's internal control over financial reporting, Friedman also took the drastic step of withdrawing its entire audit reports relating to 500.com's consolidated financial statements contained in 500.com's 2017 and 2018 20-F's.

141. In its September 28, 2020 6-K 500.com disclosed that "Friedman further advised us on September 23, 2020 that because some of the Payments had occurred in 2017 and 2018, ***the allegedly unlawful purpose of which was not known to Friedman at the date of the audit reports***

***relating to the Company's consolidated financial statements for the years ended December 31, 2017 and 2018…the integrated audit reports issued by Friedman on the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and 2018 should no longer be relied upon.***

142. In accordance with the requirements of the PSLRA and AS 2905 Friedman sent a letter to the SEC, (appended as Exhibit 16.1 to 500.com's September 28, 2020 6-K) stating that it agrees with 500.com's statements concerning its resignation.

143. Because Friedman resigned and retracted its 2017 and 2018 audit reports 500.com was forced to engage a new auditor to re-audit its consolidated financial statements and the effectiveness of its internal control over financial reporting for the 2017 and 2018 fiscal years.

144. 500.com has been unable to file its required 20-F with the SEC and has received notifications from the NYSE that its stock is in danger of being de-listed.

**Expert Distinguished Lecturer Thomas J. Ray**

145. Prior to filing the Second Amended Complaint, Plaintiffs engaged Thomas J. Ray, a certified public accountant and audit expert. Mr. Ray has provided Plaintiffs with advice and guidance on the standards applicable to public company audits and an opinion as to the significance of Friedman's resignation.

146. Mr. Ray is a New York Certified Public Accountant and a Distinguished Lecturer at Baruch College, CUNY where he teaches auditing to graduate and undergraduate students. Professor Ray is also a consultant on audit policy and provides a wide range of consulting services on the application of professional practice standards by certified public accountants.

147. Mr. Ray has 38 years of experience as an audit professional and dedicated a significant portion of his career to writing auditing, ethical and attestation standards at the PCAOB

in Washington D.C. and the American Institute of Certificate Public Accountants ("AICPA"). Mr. Ray has served as the Chief Auditor and Director of Processional Standards at the PCAOB as well as the Director of Audit and Attestation Standards at the AICPA. Mr. Ray's resume is attached as Exhibit 1 to this Complaint.

148. Mr. Ray reviewed 500.com's September 28, 2020 6-K disclosing Friedman's resignation and the portions of 500.com's SEC filings that are relevant to this action.

149. Mr. Ray explained that when an independent auditor discovers a material weakness in the company's internal control over financial reporting that was not known to the auditor at the time it issued its audit opinion, the auditor normally withdraws its opinion concerning the effectiveness of the company's internal control over financial reporting. The auditor will then re-issue its report, changing the opinion from "unqualified" to "adverse" ("… in our opinion, the company's internal control over financial reporting was not effective …"), and describe the material weakness in company's internal control.

150. Mr. Ray points out that in 500.com's case Friedman not only withdrew its opinion on the effectiveness of the Company's internal control over financial reporting but also withdrew its entire reports for the Company's Class Period consolidated financial statements.

151. According to Mr. Ray, Friedman's complete withdrawal of its entire audit reports on 500.com's Class Period consolidated financial statements is a very infrequent and significant occurrence in the auditing profession.

152. Mr. Ray explains that Friedman's resignation and complete withdrawal of its reports is a drastic step considering that Friedman could instead have withdrawn only its opinion concerning the Company's internal controls and amended its opinion to identify the specific problem with the Company's internal controls.

153. Indeed, because of the illegal bribery scheme Friedman determined that the Company's Class Period financial statements were unreliable. Friedman's complete withdrawal as 500.com's auditor and full retraction of its audit reports demonstrates Friedman's distrust in 500.com's management and disbelief in the findings of 500.com's self-serving internal investigation.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

154. Throughout the Class Period, Defendants made materially false and misleading statements about the Company's business as well as its operational and compliance policies and practices. Specifically, Defendants made false and misleading statements in 500.com's SEC filings and failed to make required disclosures in their Form 20-F SEC filings for fiscal years 2017 and 2018 as described below:

(a) 500.com carried out and concealed a bribery scheme to obtain preferential treatment in connection with its bid to run a Japanese casino resort;

(b) Defendants falsely or misleadingly described the operations of its Japan subsidiary Nihon as "investment holding" and as having no substantive operations;

(c) Defendants falsely or misleading conveyed that 500.com and its directors, officers and employees complied with its Code of Business Conduct and Ethics which requires them to comply with all applicable laws and prohibits "the payment of bribes, kickbacks or inducements to foreign officials;"

(d) Defendants falsely stated that their internal controls over financial reporting were effective and Defendants Pan and Yuan filed Certifications stating that they complied with §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") when they were aware of, or deliberately reckless in disregarding, that the Company's internal controls over financial reporting were deficient and that their Certifications were false;

(e) Defendants falsely stated in their Sarbanes-Oxley certifications that they had disclosed to 500.com's auditor any fraud, when in fact they hid the illegal bribery scheme from its auditor; and

(f) Defendants failed to make the appropriate risk disclosures required by Item 3 of Form 20-F.

155. Defendants knew that discovery of the foregoing misconduct could subject the Company and its executives to criminal and civil liability, endanger the Company's reputation and lead to other regulatory scrutiny and financial risks, but Defendants hid the wrongful conduct nevertheless. As a result of Defendants' false and misleading statements, 500.com shares traded at artificially inflated prices during the Class Period and members of the Class suffered significant losses and damages once the truth became known.

156. The statements herein were materially false and misleading when made because they omitted the following true facts, which were known to or recklessly disregarded by Defendants, including:

(a) the Company's internal controls were so inadequately designed and deficient that employees were able to, and did, engage in an unlawful bribery scheme;

(b) the Company engaged in an unlawful bribery scheme to secure preferential treatment in connection with its bid to run a Japanese casino resort;

(c) 500.com's employees and executives violated the Company's own mandatory Code of Business Conduct and Ethics;

(d) the Company's criminal and civil liability resulting from its involvement in an unlawful bribery scheme; and

(e) the reputational risk posed by evidence of an unlawful bribery scheme.

157. Defendants' false or misleading statements are detailed below.

158. On April 27, 2018, 500.com filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2017 (the "2017 20-F"). The 2017 20-F stated the following regarding the Company's Code of Business Conduct and Ethics:

> Our board of directors has adopted a code of ethics that applies to our directors, officers, employees and agents, including certain provisions that specifically apply to our chief executive officer, chief financial officer, chief strategy officer, financial controller and any other persons who perform similar functions for us. We have

filed our code of business conduct and ethics as an exhibit to our registration statement on Form F-1.

159. The Code of Business Conduct and Ethics, in turn states:

500.com Limited and its subsidiaries (collectively, the "Company") are committed to conducting their business in accordance with all applicable laws and the highest standards of the Company. In general, employees should strive to comply with the law and conduct business honestly, fairly and in the best interests of the Company. ***To the extent this Code requires a higher standard than required by commercial practice or applicable laws, we <u>adhere to these higher standards</u>***.
This Code applies to all of the directors, officers, employees and advisors of the Company, ***whether they world for the company on a full-time, part-time <u>consultative</u>, or temporary basis.*** We also refer to our Chief Executive Officer, Chief Financial Officer, our other executives and any other person who perform similar functions for the Company as "executive officers."

Waivers of the Code

Waivers of this Code may be made only by the Board or the appropriate committee of the Board and will be promptly disclosed to the public as required by law or the rules of the New York Stock Exchange. Waivers of this Code will be granted on a case-by-case basis and only in extraordinary circumstances

COMPLIANCE WITH LAWS, REGULATIONS AND POLICIES

Employees have an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, <u>laws covering bribery and kickbacks</u>, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, <u>foreign corrupt practices</u>, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. It is your responsibility to understand and comply with the laws, regulations and policies that are relevant to your position.

If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Compliance Officer. ***Failure to comply with applicable laws and regulations can result in civil and criminal liability against you and the Company, as well as disciplinary action by the Company against you, including termination of employment***. You should contact the Compliance Officer if you have any questions about the laws, regulations and policies that may apply to you.

***The Foreign Corrupt Practices Act The Foreign Corrupt Practices Act (the "FCPA") prohibits the Company and its employees and agents from offering or***

> ***giving money or any other item of value to win or retain business or to influence any act or decision of any governmental official, political party, candidate for political office or official of a public international organization. The FCPA prohibits the payment of bribes, kickbacks or other inducements to foreign officials***. This prohibition also extends to payments to a sales representative or agent if there is reason to believe that the payment will be used indirectly for a prohibited payment to foreign officials. Violation of the FCPA is a crime that can result in severe fines and criminal penalties, as well as disciplinary action by the Company, including termination of employment

160. The foregoing statements that were contained in the Company's Code of Business Conduct and Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) 500.com was not committed to conducting its business in accordance with "all applicable laws" because it authorized its executives to pay bribes in contravention of the Code; 2) 500.com did not obligate its employees to comply with the laws covering bribery or kickbacks because Defendants knew about or recklessly disregarded the payment of bribes to government officials; 3) 500.com and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure as well as reputational damage; 4) 500.com authorized and made multiple cash payments to public officials to secure illegal favors for its Japan casino bid; and (5) none of 500.com's employees obtained waivers to the Code that were disclosed.

161. On April 27, 2018, Defendants Pan and Yuan each signed and filed SOX certifications attached as exhibits to 500.com's 2017 20-F attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over

financial reporting, and disclosed any change in the company's internal control over financial reporting. They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact, necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading. They further certified that they disclosed to the Company's auditors and board of directors: (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role over the Company's internal control over financial reporting.

162. Pan's and Yuan's certifications were false and misleading because Pan and Yuan were aware that: a) 500.com's internal control over financial reporting was not properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Japanese government officials to secure preference in connection with 500.com's bid to operate an Integrated Resort in Japan and b) they had not disclosed to 500.com's auditor the material fraud involving 500.com's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

163. In 500.com's 2017 20-F the Company stated that the principal activity of its Japanese subsidiary, 500.com Nihon Co., Ltd., was investment holding, and that it had no substantive operations of its own.

164. The foregoing statement describing 500.com Nihon Co. Ltd. was materially false and misleading when issued because it omitted to disclose that Nihon's substantive operations included an illegal bribery scheme designed to obtain preferable treatment in connection with Nihon's bid to run an Integrated Resort in Japan.

165. Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'" The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

166. 500.com's 2017 20-F contained generalized disclosures related to price volatility and risk related to problems obtaining new licenses or permits as follows:

> Certain of our game providers require various approvals, licenses and permits to conduct their business, including business to business, or B2B, gaming and software licenses. We cannot assure you that these providers will not encounter significant problems in obtaining new or renewing existing approvals, licenses and permits, or that they will continue to satisfy the conditions to which such approvals, licenses and permits granted. If previously obtained approvals, licenses and permits are revoked and/or if the providers fail to obtain and/or maintain the necessary approvals, licenses and permits required to conduct their business and/or host or manage games as currently provided, we may be required to temporarily suspend the operation of certain gaming services, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

167. Notwithstanding the disclosure requirement set forth in Item 3.D, 500.com's Item 3.D disclosures contained in its 2017 20-F were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from Defendants' paying illegal bribes in exchange for preferential treatment in connection with its bid to run a casino in Japan: (i) the risk that public disclosure of the bribery scheme would result in 500.com's executives facing criminal charges in Japan; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the risk that public disclosure of the bribery scheme would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business; and (iv) the

risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of 500.com ADS.

168. On April 22, 2019, 500.com filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2018 (the "2018 20-F"). The 2018 20-F stated the following regarding the Company's Code of Business Conduct and Ethics:

> Our board of directors has adopted a code of ethics that applies to our directors, officers, employees and agents, including certain provisions that specifically apply to our chief executive officer, chief financial officer, chief strategy officer, financial controller and any other persons who perform similar functions for us. We have filed our code of business conduct and ethics as an exhibit to our registration statement on Form F-1.

169. The Code of Business Conduct and Ethics, in turn states:

> 500.com Limited and its subsidiaries (collectively, the "Company") are committed to conducting their business in accordance with all applicable laws and the highest standards of the Company. In general, employees should strive to comply with the law and conduct business honestly, fairly and in the best interests of the Company. ***To the extent this Code requires a higher standard than required by commercial practice or applicable laws, we <u>adhere to these higher standards</u>***.
> This Code applies to all of the directors, officers, employees and advisors of the Company, ***whether they world for the company on a full-time, part-time <u>consultative</u>, or temporary basis.*** We also refer to our Chief Executive Officer, Chief Financial Officer, our other executives and any other person who perform similar functions for the Company as "executive officers."
>
> Waivers of the Code
>
> Waivers of this Code may be made only by the Board or the appropriate committee of the Board and will be promptly disclosed to the public as required by law or the rules of the New York Stock Exchange. Waivers of this Code will be granted on a case-by-case basis and only in extraordinary circumstances
>
> COMPLIANCE WITH LAWS, REGULATIONS AND POLICIES
>
> Employees have an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, <u>laws covering bribery and kickbacks</u>, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, <u>foreign corrupt practices</u>, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational

> health and safety, false or misleading financial information or misuse of corporate assets. It is your responsibility to understand and comply with the laws, regulations and policies that are relevant to your position.
>
> If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Compliance Officer. ***Failure to comply with applicable laws and regulations can result in civil and criminal liability against you and the Company, as well as disciplinary action by the Company against you, including termination of employment***. You should contact the Compliance Officer if you have any questions about the laws, regulations and policies that may apply to you.
>
> ***The Foreign Corrupt Practices Act The Foreign Corrupt Practices Act (the "FCPA") prohibits the Company and its employees and agents from offering or giving money or any other item of value to win or retain business or to influence any act or decision of any governmental official, political party, candidate for political office or official of a public international organization. The FCPA prohibits the payment of bribes, kickbacks or other inducements to foreign officials***. This prohibition also extends to payments to a sales representative or agent if there is reason to believe that the payment will be used indirectly for a prohibited payment to foreign officials. Violation of the FCPA is a crime that can result in severe fines and criminal penalties, as well as disciplinary action by the Company, including termination of employment

170. The foregoing statements that were contained in the Company's Code of Business Conduct and Ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: 1) 500.com was not committed to conducting its business in accordance with "all applicable laws" because it authorized its executives to pay bribes in contravention of the Code; 2) 500.com did not obligate its employees to comply with the laws covering bribery or kickbacks because Defendants knew about or recklessly disregarded the payment of bribes to government officials; 3) 500.com and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure as well as reputational damage; 4) 500.com authorized and made multiple cash payments to public officials to secure illegal favors for its Japan casino bid; and (5) none of 500.com's employees obtained waivers to the Code that were disclosed.

171. On April 22, 2019, Defendants Pan and Yuan each signed and filed SOX certifications attached as exhibits to 500.com's 2018 20-F attesting that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting and had: (i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, (ii) evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting. They also certified that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact, necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading. They further certified that they disclosed to the Company's auditors and board of directors: (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role over the Company's internal control over financial reporting.

172. Pan's and Yuan's certifications were false and misleading because Pan and Yuan were aware that: a) 500.com's internal control over financial reporting was not properly designed, was deficient, had material weaknesses, and had been circumvented by management to carry out a bribery scheme with corrupt Japanese government officials to secure preference in connection with 500.com's bid to operate a casino in Japan and b) they had not disclosed to 500.com's auditor the material fraud involving 500.com's bribery scheme which subjected the Company and its executives to criminal and civil liability and reputational damage.

173. In 500.com's 2018 20-F the Company stated that the principal activity of its Japanese subsidiary, 500.com Nihon Co., Ltd., was investment holding, and that it had no substantive operations of its own.

174. The foregoing statement describing 500.com Nihon Co. Ltd. was materially false and misleading when issued because it omitted to disclose that Nihon's substantive operations included an illegal bribery scheme designed to obtain preferable treatment in connection with Nihon's bid to run an Integrated Resort in Japan.

175. Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'" The instructions to Item 3.D state: "Risk factors should be concise and explain clearly how the risk affects the issuer or securities."

176. 500.com's 2018 20-F contained generalized disclosures related to price volatility and risk related to problems obtaining new licenses or permits as follows:

> Certain of our game providers require various approvals, licenses and permits to conduct their business, including business to business, or B2B, gaming and software licenses. We cannot assure you that these providers will not encounter significant problems in obtaining new or renewing existing approvals, licenses and permits, or that they will continue to satisfy the conditions to which such approvals, licenses and permits granted. If previously obtained approvals, licenses and permits are revoked and/or if the providers fail to obtain and/or maintain the necessary approvals, licenses and permits required to conduct their business and/or host or manage games as currently provided, we may be required to temporarily suspend the operation of certain gaming services, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

177. Notwithstanding the disclosure requirement set forth in Item 3.D, 500.com's Item 3.D disclosures contained in its 2018 20-F were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from

Defendants' paying illegal bribes in exchange for preferential treatment in connection with its bid to run a casino in Japan: (i) the risk that public disclosure of the bribery scheme would result in 500.com's executives facing criminal charges in Japan; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties; (iii) the risk that public disclosure of the bribery scheme would result in the Company's criminal and/or civil liability in the United States and other countries in which it does business; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of 500.com ADS.

**INVESTORS LEARN THE TRUTH**

178. On December 7 and 8, 2019 the Special Investigation Unit of the Tokyo District Public Prosecutors office raided the homes of two of Akimoto's former secretaries.

179. On December 17, 2019 the Japanese news media reported on the raids of Akimoto's assistants' homes. Tokyo prosecutors leaked that the investigation was in connection with excessive amounts of cash being brought into Japan without notifying customs in advance, in violation of the Foreign Exchange and Foreign Trade Act. Prosecutors stated that the raids were connected to a Shenzen-based company interested in the Japanese integrated resorts market but refused to name the company.

180. Then, on December 25, 2019 Tokyo prosecutors arrested Akimoto on suspicion of taking $33,800 in bribes. Akimoto was the first lawmaker in Japan to be arrested in almost a decade. That same day, Akimoto announced his intention to resign from Japan's ruling Liberal Democratic Party.

181. Also on December 25, 2019, Tokyo prosecutors arrested three employees of 500.com: Zheng Xi, an executive of 500.com's Nihon subsidiary and Konno and Nakazato.

182. Then, on December 31, 2019, 500.com announced in a press release, that the Company's Board had formed a "Special Investigation Committee" to conduct an internal investigation into "alleged illegal money transfers" and the role 500.com consultants played after Tokyo Prosecutors arrested a current 500.com consultant and former director and two former 500.com consultants. In the press release the Company also announced that Defendant Pan would step aside from all of his positions at the Company in order to "ensure a thorough and fair investigation." The Company also announced 500.com's Chairman Xudong Chen, had resigned. The press release stated, in pertinent part:

> SHENZHEN, China, December 31, 2019 /PRNewswire/ -- 500.com Limited (NYSE: WBAI) ("500.com" or the "Company"), a leading online sports lottery service provider in China, today announced that the Company's Board of Directors (the "Board") ***has formed a Special Investigation Committee ("SIC") to internally investigate alleged illegal money transfers and the role played by consultants following the arrest of one consultant(also a former director of the Company's subsidiary in Japan) and two former consultants by the Tokyo District Public Prosecutors Office.***
>
> Concurrently Mr. Xudong Chen, Chairman of the Board, has resigned, effective December 30, 2019. Mr. Chen's resignation was not based on any disagreement with the Company on any matter related to its business, finance, accounting and/or any other affairs. In addition, the Board has accepted the request from ***Mr. Zhengming Pan, Director and Chief Executive Officer, to temporarily step aside from his positions, effective December 30, 2019, until the conclusion of the SIC's investigation in order to ensure a thorough and fair investigation***.

(Emphasis added).

183. On this news, shares of 500.com fell $0.91 per share or over 10% to close at $7.52 per share on January 2, 2020, the following trading day, damaging investors.

184. On January 16, 2020 500.com announced that it retained law firm King & Wood Mallesons as legal adviser to assist with its internal investigation.

185. On February 2, 2020, 500.com announced that Defendant Pan had resigned from the Company entirely.

186. On September 28, 2020 500.com announced that Friedman resigned as 500.com's auditor, withdrew its audit reports contained in 500.com's 2017 and 2018 20-F's and informed investors that they could no longer rely on 500.com's 2017 and 2018 financial statements.

187. In October 2020 Japanese news outlets reported that the former 500.com consultants who paid the bribes were each sentenced to nearly two years in prison. The CEO of 500.com's business partner in connection with the Integrated Resort project was sentenced to ten months in prison.

## LOSS CAUSATION/ECONOMIC LOSS

188. As a result of Defendants' materially false or misleading statements, 500.com's ADS were artificially inflated throughout the Class Period. Like other members of the Class who purchased at artificially inflated prices during the Class Period, Investors suffered an economic loss, *i.e.*, damages, when the trading price of 500.com's ADS declined upon the disclosure that corrected Defendants' alleged false or misleading statements.

189. The damages suffered by Investors and other members of the Class were a direct result of Defendants' misrepresentations, which artificially inflated the price of 500.com's ADS, and the subsequent significant decline in the value of 500.com's ADS once the truth regarding the Company's bribes were revealed to the market, correcting the misrepresentations and/or the economic impact thereof.

190. On December 31, 2019 the Company announced it formed a Special Investigation Committee of the Board to investigate illegal money transfers after Tokyo prosecutors arrested

three 500.com "consultants" and charged them with paying bribes. That day, the Company also announced that Pan was stepping aside as CEO.

191. On this news, 500.com's stock dropped fell $0.91 per share or over 10% to close at $7.52 per share on January 2, 2020, the following trading day, damaging investors.

192. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### Fraud-on-the-Market Doctrine

193. Investors are entitled to rely, and will rely, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. 500.com securities are traded in an efficient market;

d. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of 500.com's securities; and

e. Investors and members of the Class purchased, acquired and/or sold 500.com securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

194. At all relevant times, the market for 500.com ADS was an efficient market for the following reasons, among others:

- 500.com's ADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

1.

- During the Class Period, the average weekly trading volume for 500.com ADS on the NYSE was 265,480 shares, which represents approximately 1% of ADS available for sale during the Class Period permitting a strong presumption of reliance;

  At least 4 stock market analysts followed 500.com and wrote a total of at least 37 reports on 500.com during the Class Period. Analysts covering 500.com included Corporate Watchdogs, Sadif Analytics and MINKABU;

- 500.com regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- More than 4 member firms were active market-makers in 500.com ADS at all times during the Class Period;

- During the Class Period 500.com was eligible for S-3 registration (or F-3 in 500.com's case as a foreign private issuer);

- 500.com's market capitalization exceeded $450 million on all days during the Class Period;

- Unexpected material news about 500.com was rapidly reflected and incorporated into the Company's ADS price during the Class Period. For example, when 500.com disclosed the Board's internal investigation and Defendant Pan resigned on December 31, 2019 500.com's share price fell a material amount.

195. As a result of the foregoing, the market for 500.com promptly digested current information regarding 500.com from all publicly available sources and reflected such information in 500.com's ADS price. Under these circumstances, all purchasers of 500.com ADS during the Class Period suffered similar injury through their purchase of 500.com ADS at artificially inflated prices, and a presumption of reliance applies.

### 2. ***<u>Affiliated Ute</u>***

196. Neither Investors nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite

to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**INVESTORS' CLASS ACTION ALLEGATIONS**

197. Investors bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased 500.com ADS during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

198. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, 500.com ADS were actively traded on the NYSE. While the exact number of Class members is unknown to Investors at this time and can only be ascertained through appropriate discovery, Investors believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by 500.com or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

199. Investors' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200. Investors will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

201. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of 500.com;

(c) whether the Individual Defendants caused 500.com to issue false and misleading statements during the Class Period;

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

202. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

203. Investors repeat and reallege each and every allegation contained above as if fully set forth herein.

204. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

205. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified

above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

206. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

207. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

208. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

209. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

210. Had Investors and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

211. As a result of the wrongful conduct alleged herein, Investors and other members of the Class have suffered damages in an amount to be established at trial.

212. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act Against the Individual Defendants**

213. Investors repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

215. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

216. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

217. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of

the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Investors and the other members of the Class complain.

218. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Investors demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Investors as the Class representative;

B. Requiring Defendants to pay damages sustained by Investors and the Class by reason of the acts and transactions alleged herein;

C. Awarding Investors and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Investors hereby demand a trial by jury.

Dated: November 20, 2020 Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: *<u>/s/ Sara Fuks</u>*
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Sara Fuks (SF 6034)
275 Madison Ave., 40th Floor

New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Investors*