**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

YANG JUN *individually and on behalf of all others*
*similarly situated*,

                                Plaintiff,

               - against -

500.COM LIMITED, ZHENGMING PAN, and
QIANG YUAN,

                            Defendant.
-------------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

CV 20-806 (GRB) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

## I.    PRELIMINARY STATEMENT

    Lead Plaintiff Bryan Xuan and named Plaintiff Shiyun Shao (the "Plaintiffs")[1] bring this

securities class action individually and on behalf of all others similarly situated against

Defendants 500.com Limited ("500.com"), Zhengming Pan ("Pan"), and Qiang Yuan ("Yuan")

(collectively, the "Defendants"). *See generally* Second Amended Class Action Complaint

[DE 35]. Plaintiff has asserted that the Defendants violated Section 10(b) of the Exchange Act,

15 U.S.C. ¶ 78j(b) and that the individual Defendants Pan and Yuan violated Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a). *See id.* ¶¶ 203-18. Specifically, Plaintiffs allege that

Defendants made false statements, misrepresentations, and omissions in various SEC filings after

paying bribes of millions of yen to government officials in Japan for the purpose of securing a

lucrative license to operate a casino. *See generally* SAC. Defendants 500.com and Yuan have

filed separate motions to dismiss the Second Amended Complaint pursuant to Federal Rule of

---

[1]    Although Yang Jun appears in the caption of this action and was named in the
original Complaint, the operative Second Amended Complaint contains no allegations as to him.
Thus, when the Court refers to the "Plaintiffs," the Court is referring to Xuan and Shao.

Civil Procedure ("Rule") 12(b)(6).[2]  *See* Defendant 500.com Limited's Notice of Motion to Dismiss [DE 41]; Defendant Qiang Yuan's Notice of Motion to Dismiss [DE 46].  Plaintiffs oppose both motions, arguing primarily that the investor Plaintiffs have sufficiently alleged Defendants' misleading statements and omissions under the requirements of Rule 10b-5.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendant 500.com Limited's Motion to Dismiss ("Plaintiffs' Opp'n I") at 11; *see generally* Plaintiffs' Memorandum of Law in Opposition to Defendant Qiang Yuan's Motion to Dismiss ("Plaintiffs' Opp'n II") [DE 48].

Judge Feuerstein referred Defendants' motions to this Court for a Report and Recommendation as to whether the motions should be granted.[3]  *See* February 25, 2021 Electronic Order [DE 50].  For the reasons which follow, this Court respectfully recommends to Judge Brown that the Defendants' motions to dismiss be GRANTED.

## II.   BACKGROUND

### A.   Factual Background

The following factual allegations have been taken from the Second Amended Complaint. All facts alleged by Plaintiffs are assumed to be true for purposes of deciding the motion to dismiss and are construed in a light most favorable to Plaintiffs as the non-moving party.  *See, e.g.*, *Tanvir v. Tanzin*, 894 F.3d 449, 458 (2d Cir. 2018); *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009); *McGrath v. Bayer HealthCare Pharms. Inc.*, 393 F. Supp. 3d 161, 166 (E.D.N.Y. 2019); *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 425 (E.D.N.Y. 2012).

---

[2]      Defendant Pan has not appeared in this action.

[3]      The Honorable Sandra J. Feuerstein presided over this matter up until her untimely death, after which this case was reassigned to the Honorable Gary R. Brown.

Defendant 500.com, through its subsidiaries, provides online gaming services primarily in the People's Republic of China and Europe.  *See* SAC ¶ 2.  500.com is incorporated in the Cayman Islands and has its principal executive offices in China.  *Id.*  It began operating an online lottery service in 2001 through one of its consolidated affiliated entities.  *Id.*  On November 22, 2013, 500.com's shares began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "WBAI."  *Id.*

In 2015, China instituted a *de facto* ban on online gambling.  *Id.* ¶¶ 3, 56.  This caused the revenue of the previously profitable 500.com to take a nosedive and it forced the company to operate at a loss.  *Id.* ¶¶ 3, 57.  To stay in business, 500.com sought to enter the Japanese casino market.  *Id.* ¶¶ 4, 61.  On July 27, 2017, 500.com established a wholly owned subsidiary in Japan called "500.com Nihon Limited" and told investors that the new subsidiary's principal activities were "investment holding and that it had no substantive operations."  *Id.* ¶¶ 5, 62 (internal quotation marks omitted).  As 500.com was establishing this new subsidiary, Japan's Prime Minister was also pushing for new legislation to allow casinos to operate in Japan.  *Id.* ¶¶ 6, 63.  These policies required casinos to be part of "integrated resorts" or "IRs" that feature other attractions such as hotels, shops, and conference centers.  *Id.* ¶ 6. There were only three licenses available to operate an IR in Japan "and [to] capture a share of the "40 billion dollar market."  *Id.* ¶¶ 7, 66, 68.  However, to obtain one of these licenses, Plaintiffs allege that 500.com and its executives engaged in a scheme to illegally bribe Japanese government officials in exchange for preferential treatment in connection with 500.com's bid for a license.  *Id.* ¶¶ 7, 69.

### A.  Defendants' Bribery Scheme and Internal Investigation

Defendants' illegal bribery scheme began in August 2017.  *Id.* ¶ 8.  Defendants paid bribes to Tsukaka Akimoto, a member of Japan's legislature, who was in charge of awarding the

licenses to run integrated resorts. *Id.* 500.com paid Akimoto approximately 7.6 million yen which came in the form of compensation for speaking at a 500.com symposium, elaborate trips, and other gifts. *Id.* ¶ 9. 500.com also paid bribes to five members of Japan's parliament in exchange for preferential treatment related to the integrated resorts the licenses which totaled approximately 5 million yen. *Id.* ¶ 11. On December 7 and 8, 2019, the Tokyo District Prosecutor's Office raided the homes of two of Akimoto's secretaries and later arrested Akimoto for taking bribes from 500.com. *Id.* ¶¶ 12, 178. Several other arrests followed, including that of Zheng Xi, the executive in charge of 500.com's Japan subsidiary Nihon, several 500.com consultants and employees, the five Japan parliament members, and the CEO of 500.com's business partner for the IR bid. *Id.* ¶¶ 12-13, 18. It was not until December 17, 2019 that the Akimoto-related raids were reported by the Japanese media. *Id.* ¶ 179. Tokyo prosecutors leaked that the investigation was in connection with excessive amounts of cash being brought into Japan without notifying customs in advance. *Id.* ¶ 179. Prosecutors also revealed that the Akimoto raids were connected to a company interested in the Japanese integrated resorts market, but refused to identify the company by name. *Id.*

On December 31, 2019, 500.com announced through a press release that its Board of Directors was forming a Special Investigation Committee ("SIC") to perform an in-house probe of the bribery scheme. *Id.* ¶ 182. 500.com's chairman, Xudong Chen, resigned that same day. *Id.* ¶¶ 15, 182. Defendant Pan resigned from his post as 500.com's CEO in February 2020. *Id.* ¶ 185. The SIC was comprised of 500.com board members, not independent attorneys. *Id.* ¶ 109. The law firm of King, Wood & Mallesons was retained by 500.com as its legal advisor to assist with the internal investigation. *Id.* ¶¶ 109, 184. King, Wood & Mallesons presented its findings and analyses to the SIC on October 7, 2020. *Id.* ¶ 109. The firm concluded that the SIC did not

4

identify any violations of the U.S. Foreign Corrupt Practices Act ("FCPA").  *Id.* ¶¶ 20, 109.

However, King, Wood & Mallesons' findings were never publicly disclosed.  *Id.* ¶ 110.

### B.    Form 20-F Filings

On February 9, 2018, 500.com appointed Friedman LLP as its independent auditor "to

conduct the audit of its financial statements and review the effectiveness of the Company's

internal control over financial reporting."  *Id.* ¶ 126.   Friedman audited 500.com's financial

statements for 500.com's 2017 and 2018 Form 20-F filings with the SEC.  *Id.* ¶ 131.   Friedman

also audited 500.com's internal control over financial reporting for those same years.  *Id.*   In

connection with 500.com's Form 20-F filings for 2017 and 2018, Defendants Pan and Yuan both

signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") representing to

investors that they disclosed any fraud to Friedman.  *Id.* ¶ 132.

### 1.    *2017 Form 20-F*

500.com's 2017 20-F form was filed on April 27, 2018 and contained Friedman's report

for the fiscal year which ended on December 31, 2017.  *Id.* ¶ 133.   Friedman's 2017 report

stated:

> We have audited the accompanying consolidated balance sheet of
> 500.com Limited and Subsidiaries (collectively, the "Company") as
> of December 31, 2017, and the related consolidated statements of
> comprehensive loss, changes in shareholders' equity, and cash flows
> for the year then ended, and the related notes (collectively referred
> to as the "financial statements"). We also have audited the
> Company's internal control over financial reporting as of December
> 31, 2017 based on criteria established in Internal Control—
> Integrated Framework (2013) issued by the Committee of
> Sponsoring Organizations of the Treadway Commission ("COSO").
>
> In our opinion, the financial statements referred to above present
> fairly, in all material respects, the financial position of the Company
> as of December 31, 2017, and the results of its operations and its
> cash flows for the year then ended, in conformity with accounting
> principles generally accepted in the United States of America. Also,

in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.

**Basis for Opinion**

***The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's financial statements and an opinion on the Company's internal control over financial reporting based on our audits.*** We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

*Id.* (emphasis in original).

The Form 20-F also provided that Nihon, 500.com's Japanese subsidiary, had no substantive operations of its own and that its primary activity was investment holding. *Id.* ¶ 163. The 2017 Form 20-F then stated that 500.com adopted a code of ethics. *Id.* ¶ 158. 500.com's Code of Business Conduct and Ethics provides that "employees should strive to comply with the law and conduct business honestly, fairly and in the best interests of the Company. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, we adhere to these higher standards." *Id.* ¶ 159. The Code applied to all directors, officers, employees, and advisors who worked full-time, part-time, or on a consultative or temporary

6

basis. *Id.* The Code also obligated employees to comply with all laws, rules, and regulations applicable to 500.com's operations, including, laws covering bribery, kickbacks, and foreign corrupt practices. *Id.* The Code described the FCPA and stated that 500.com and its employees and agents were prohibited from "offering or giving money or any other item of value to win or retain business or to influence any act or decision of any governmental official . . . or official of a public international organization. The FCPA prohibits the payment of bribes, kickbacks or other inducements to foreign officials." *Id.* Lastly, the Code includes a provision that waivers of the Code "may be made only by the Board or the appropriate committee of the Board and will be promptly disclosed to the public as required by law or the rules of the New York Stock Exchange. Waivers . . . will be granted on a case-by-case basis and only in extraordinary circumstances." *Id.*

### 2.    *2018 Form 20-F*

500.com's 2018 20-F form was filed with the SEC on April 22, 2019. *Id.* ¶ 134. The 2018 20-F form also included a report by Friedman, which stated:

> Opinions on the Financial Statements and Internal Control over Financial Reporting
>
> We have audited the accompanying consolidated balance sheet of 500.com Limited and Subsidiaries (collectively, the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of comprehensive loss, changes in shareholders' equity, and cash flows for each of the two years in the period ended December 31, 2018, and the related notes (collectively referred to as the "financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018 based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations

7

and its cash flows for each of the two years in the period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.

**Basis for Opinion**

***The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's financial statements and an opinion on the Company's internal control over financial reporting based on our audits.*** We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

*Id.* (emphasis in original). Similar to the 2017 Form-F, the 2018 Form-F also indicated Nihon was primarily an investment holding company that had no substantive operations of its own in addition to providing that 500.com adopted a code of ethics. *Id.* ¶¶ 168-69. The provisions of the code of ethics referenced by the 2018 Form-F appear virtually identical to the Code referenced in the 2017 Form-F.

### 3. SOX Certifications

On April 27, 2018 and April 22, 2019, Defendants Pan and Yuan signed and filed SOX certifications which were attached to 500.com's 2017 and 2018 Form 20-F SEC filings.  In both of these SOX certifications, Defendants Pan and Yuan stated that "that they were responsible for establishing and maintaining disclosure controls and procedures and internal control over financial reporting." *Id.* ¶¶ 161, 171.  The certifications provided that they:  "(i) designed such internal control to ensure that material information relating to the Company is made known to them timely, (ii) designed such internal control to provide reasonable assurance regarding the reliability of financial reporting and financial statements in accordance with generally accepted accounting principles, [(iii)] evaluated the internal controls over financial reporting, and disclosed any change in the company's internal control over financial reporting." *Id.* Defendants Pan and Yuan also certified "that they had reviewed the 20-F and that it does not contain any untrue statement of a material fact, or omit to state a material fact, necessary to make the statements made . . . not misleading."  *Id.*  Lastly, they certified that they disclosed to 500.com's auditors and board of directors:  "a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role over the Company's internal control over financial reporting."  *Id.*

### 4. Item 3.D of Form 20-F

In disclosing its risk factors in accordance with Item 3.D of Form 20-F, the Complaint alleges that 500.com's 2017 and 2018 Form 20-F filings "contained generalized disclosures related to price volatility and risk related to problems obtaining new licenses or permits."  *Id.* ¶¶ 166, 176.  In particular, the disclosures made on these Form 20-F filings by 500.com provide:

> Certain of our game providers require various approvals, licenses and permits to conduct their business, including business to business, or B2B, gaming and software licenses. We cannot assure you that these providers will not encounter significant problems in obtaining new or renewing existing approvals, licenses and permits, or that they will continue to satisfy the conditions to which such approvals, licenses and permits granted. If previously obtained approvals, licenses and permits are revoked and/or if the providers fail to obtain and/or maintain the necessary approvals, licenses and permits required to conduct their business and/or host or manage games as currently provided, we may be required to temporarily suspend the operation of certain gaming services, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

*Id.* ¶¶ 166, 176.

### B.    Form 6-K

Friedman resigned as 500.com's auditor after it was informed of the SIC's conclusion that no FCPA violations had taken place.  Friedman also withdrew its opinions concerning the effectiveness of 500.com's internal controls and also withdrew its "audit reports of [500.com's] Class Period consolidated financial statements" as set forth in the 2017 and 2018 Form 20-F filings.  *Id.* ¶¶ 22, 140.  On September 28, 2020, 500.com filed a Form 6-K with the SEC informing investors that Friedman resigned as its auditor because it disagreed with 500.com's management regarding the effectiveness of its "internal control over financial reporting in light of certain alleged unlawful payments."  *Id.* ¶¶ 19, 136.  The Form 6-K also disclosed that

> Friedman further advised [500.com] on September 23, 2020 that because some of the Payments had occurred in 2017 and 2018, the allegedly unlawful purpose of which was not known to Friedman at the date of the audit reports relating to the Company's consolidated financial statements for the years ended December 31, 2017 and 2018…the integrated audit reports issued by Friedman on the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and 2018 should no longer be relied upon.

*Id.* ¶ 141.  Friedman sent a letter to the SEC stating that it agreed with 500.com's statements concerning its resignation.  *Id.* ¶ 142.

### C.  Allegedly False or Misleading Statements

#### 1.  500.com's Code of Business Conduct and Ethics

Plaintiffs allege that 500.com's Code of Business Conduct and Ethics, as contained in both its 2017 and 2018 Form 20-F filings, was materially false or misleading or omitted material facts for five reasons:  (1) 500.com was not committed to conducting its business in accordance with "all applicable laws" because it authorized bribes to be paid in contravention of the Code; (2) "500.com did not obligate its employees to comply with the laws covering bribery or kickbacks because Defendants knew about or recklessly disregarded the payment of bribes to government officials;" (3) 500.com and its executives engaged in an unlawful bribery scheme which subjected the Company to criminal and civil exposure as well as reputational damage; (4) 500.com authorized and made multiple cash payments to public officials to secure illegal favors for its Japan casino bid; and (5) none of 500.com's employees obtained waivers to the Code that were disclosed.  *Id.* ¶¶ 160, 170.

#### 2.  Defendant Pan's and Yuan's SOX Certifications

Plaintiffs then allege that the SOX certifications made by Defendants Pan and Yuan which are attached to the 2017 and 2018 Form 20-F filings were false and misleading because: (1) they were aware that 500.com's internal control over financial reporting was not properly designed, was deficient, and had material weaknesses as it was circumvented to carry out a bribery scheme to secure a license to operate an integrated resort in Japan; and (2) they did not disclose to Friedman the fraud involving the bribery scheme which subjected 500.com to criminal and civil liability as well as reputational damage.  *Id.* ¶¶ 162, 172.

### 3.    Nihon's Principal Activity

Next, Plaintiffs allege that the statements in 500.com's 2017 and 2018 Form 20-F filings which provide that Nihon's principal activity was investment holding were materially false and misleading.  *Id.*  ¶¶ 163-64, 174.  According to the SAC, these statements were false and misleading because 500.com omitted from its 20-F filings the fact that Nihon's substantive operations included an illegal bribery scheme designed to secure preferential treatment in its bid to run an integrated resort in Japan.  *Id.* ¶¶ 164, 174.

### 4.    Item 3.D Risk Factors

Lastly, Plaintiffs allege that the risk factors 500.com provided in its Item 3.D disclosures for the 2017 and 2018 Form 20-F filings were incomplete and materially misleading for several reasons.  *Id.* ¶¶ 167, 177.  Specifically, Plaintiffs assert that 500.com did not disclose a variety of risks which stemmed from its payment of illegal bribes, *i.e.*, the risk of criminal charges in Japan, the risk of criminal and/or civil liability in the United State and other countries in which 500.com conducts business, subjection to fines and penalties, loss of investor confidence, and decline of stock price.  *Id.* ¶¶ 167, 177.

## B.    Procedural Background

Yang Jun commenced this class action on February 13, 2020 on behalf of persons and entities who acquired publicly traded 500.com securities (the "Class") between April 27, 2018 and December 31, 2019 (the "Class Period").  *See generally* Complaint [DE 1].  Competing motions for the appointment of lead plaintiff and the selection of lead counsel were filed by movants Bryan Xuan and Brian Zhang on March 16, 2020.  *See* DE 10; DE 14.  Zhang withdrew his motion and Magistrate Judge Gold granted Xuan's motion as unopposed.  *See* DE 16;

March 26, 2020 Electronic Order.[4]  Xuan selected The Rosen Law Firm, P.A. as lead counsel. *See* DE 14; DE 15.

On April 6, 2020, this case was reassigned from Judge Ross to Judge Feuerstein.  The parties filed a stipulation on April 23, 2020 which provided that Xuan would file a consolidated Amended Complaint by June 25, 2020 and that 500.com's deadline to respond to the Amended Complaint would be August 24, 2020.  *See* DE 20 at 2.  This stipulation also set forth a briefing schedule for a motion to dismiss should 500.com opt to file such a motion.  *Id.*  On June 22, 2020, Judge Feuerstein "so ordered" the parties' stipulation but modified the proposed briefing schedule for 500.com's motion to dismiss.  *See* DE 22.

The Amended Complaint was filed by Lead Plaintiff Xuan and named Plaintiff Shiyun Shao on June 25, 2020.  *See generally* Amended Class Action Complaint ("Am. Compl.") [DE 23].  An Initial Conference was conducted by Judge Feuerstein on June 29, 2020.  *See* DE 24.  In accordance with directives issued by Judge Feuerstein during that Initial Conference, the parties submitted an amended briefing schedule for 500.com's motion to dismiss the Amended Complaint on June 30, 2020.  *See* DE 25.  After Defendants 500.com and Yuan served their motions to dismiss the Amended Complaint and Plaintiffs served opposition, the parties stipulated on October 21, 2020 that Plaintiffs were permitted to file another amended complaint to include allegations that pertained to events which transpired after this case was commenced. *See* DE 33.  Judge Feuerstein granted Plaintiffs' request to file a second amended complaint and set a briefing schedule for motions to dismiss that pleading.  *See* October 22, 2020 Order [DE 34].

---

[4]    This case was initially assigned to Judge Allyne R. Ross and Magistrate Judge Steven Gold.

13

The Second Amended Complaint ("SAC") was filed on November 20, 2020 and, like the Amended Complaint, was brought by Lead Plaintiff Bryan Xuan and named Plaintiff Shiyun Shao. *See generally* SAC. Other than appearing in the caption of the SAC, Yang Jun's name does not otherwise appear in this pleading. In the SAC, Plaintiffs assert two causes of action on behalf of the Class. *See id.* ¶¶ 1, 197. Plaintiffs' first claim is for a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants for making the four types of false or misleading statements described above. *See id.* ¶¶ 203-12. Plaintiffs' second claim is for a violation of Section 20(a) of the Exchange Act against the two individual Defendants. *See id.* ¶¶ 213-18. In this Count, Plaintiffs allege that the individual Defendants acted as controlling persons of 500.com and caused 500.com to engage in the unlawful activities complained of. *See id.* ¶¶ 216-18. Defendants 500.com and Qiang Yuan filed the instant motions to dismiss the SAC on February 19, 2021. *See* DE 41; DE 46.

### C. The Parties' Positions

#### 1. *500.com's Motion to Dismiss*

##### a. 500.com's Memorandum of Law

500.com seeks dismissal of Plaintiffs' first cause of action which was asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See* 500.com Limited's Memorandum of Law in Support of its Motion to Dismiss ("Def. 500.com's Mem.") [DE 42]. In support of its motion, 500.com also submitted copies of its Form 20-Fs for 2017, 2018, and 2019 as well as a copy of 500.com's Form 6-K that was provided to the SEC on September 28, 2020. *See* 2017 Form 20-F [DE 43-1]; 2018 Form 20-F [DE 43-2]; 2019 Form 20-F [DE 43-4]; September 28,

2020 Form 6-K [DE 43-3].[5] Generally, 500.com argues that this cause of action should be dismissed because Plaintiffs failed to satisfy heightened pleading requirements pursuant to Rule 9 and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 500.com's Mem. at 1. 500.com then argues that the four types of statements which Plaintiffs complain of (*i.e.*, the Code of Conduct, the SOX certifications, the description of the Nihon subsidiary, and the risk disclosures) are not misleading nor actionable as a matter of law. *See id.* at 10-16. Particularly with respect to the risk disclosures, 500.com argues that it was not required to disclose any uncharged or unadjudicated wrongdoing at the time the Form 20-F filings were made. *Id.* at 13-14. Next, 500.com argues that the timing of the alleged acts and lack of probative value of auditor Friedman LLP's resignation defeat any allegations that their statements were misleading. *See id.* at 16-17. In particular, 500.com contends that the last wrongful acts alleged in the SAC occurred in February 2018 -- pre-dating the start of the class period, namely, April 27, 2018, by two months. *See id.* at 16 (citing SAC ¶ 87). Finally, 500.com contends that the SAC does not allege particularized facts which give rise to a strong inference of scienter. *Id.* at 18-25. Rather, 500.com submits that that any allegations of scienter are set forth in "totally conclusory terms" and do not meet the exacting standard to plead scienter under the PSLRA. *Id.* at 19.

### b.    Plaintiffs' Opposition

In their opposition to 500.com's motion, Plaintiffs contend that they have sufficiently alleged misleading statements as well as scienter. Pl.'s Opp'n I [DE 44]. First, as to the SOX certifications, Plaintiffs assert these statements are actionable because Defendants Pan and Yuan did not disclose any fraud to 500.com's auditor, Friedman LLP, which prompted Friedman to

---

[5]    Copies of these documents are not attached as exhibits to the Second Amended Complaint. However, since each of these documents form the basis of Plaintiffs' claims and are heavily relied upon, the Court deems them integral and will consider them where appropriate.

resign and retract its audit reports.  *See id.* at 11-12.   Plaintiffs then argue that 500.com's Code

of Conduct is actionable by analogizing the Code at issue here with the code analyzed in *In re*

*Tenaris, S.A. Securities Litig.*, which was found to potentially "leave a reasonable investor with

the impression that Tenaris does not accept or forgive any instance of bribery among its

executives." *Id.* at 13-14 (quoting *In re Tenaris, S.A. Securities Litig.*, 493 F. Supp. 3d 143, 160

(E.D.N.Y. Oct. 9, 2020)).   Plaintiffs also address the alleged misstatements concerning

Defendants' description of Nihon.  *See id.* at 15-16.   According to Plaintiffs, Defendants had no

duty to discuss Nihon's business activities, but once they spoke about it, such a duty arose and

they were required "to tell the whole truth." *Id.* at 16.   As such, although 500.com's financial

statements described Nihon as not having any substantial operations, Plaintiffs contend that

Nihon was actually used as a vehicle to carry out Defendants' bribery scheme. *Id.* at 15.   With

respect to the risk disclosures, Plaintiffs maintain that the risks the Defendants disclosed (*i.e.*,

that they could not ensure that significant problems in obtaining new or renewing existing

approvals, licenses, or permits) had already materialized at the time the disclosures were made

because of the bribes paid.  *See id.* at 17-18.

Turning to 500.com's arguments regarding scienter, Plaintiffs contend they alleged

scienter based upon their allegations of Defendant Pan's connection with and focus on 500.com's

bid to open an integrated resort as well as his ties to Akimoto.  *See id.* at 19-20 (citing SAC

¶¶ 78-80, 86-87).   Because they claim they have sufficiently pled scienter as to Defendant Pan,

Plaintiffs assert that Pan's scienter can be imputed to 500.com.  *See id.* at 20-21.   Plaintiffs also

contend that the scienter of Zheng Xi, the executive of the Nihon subsidiary who was arrested for

paying bribes to Akimoto, can be imputed to 500.com.  *See id.* at 21-22.   Ultimately, Plaintiffs

describe five circumstances which they claim bolster their allegations and give rise to an

16

inference of scienter:  (1) Friedman's "noisy" resignation and withdrawal of its audit reports; (2) false SOX certifications which support a strong inference of actual knowledge or deliberate recklessness; (3) the integrated resort project involved 500.com's core operations and therefore the Individual Defendants are presumed to have knowledge of the bribery scheme; (4) the resignations of Defendant Pan and 500.com's Chairman Chen; and (5) 500.com's failure to raise a more compelling inference against scienter.  *See id.* at 22-25.

### c.    500.com's Reply

In its reply to Plaintiffs' opposition, 500.com reiterates its position that the Plaintiffs failed to allege that any of the challenged statements were misleading and that Plaintiffs failed to adequately plead scienter.  *See generally* Defendant 500.com Limited's Reply Memorandum of Law ("Def. 500.com's Reply") [DE 45].  500.com first contends that Plaintiffs' reliance on the *Tenaris* decision is misplaced with respect to the actionability of 500.com's Code of Conduct and Ethics.  *See id.* at 4-5.  Rather, 500.com argues that the decision of *Ulbricht v. Ternium S.A.*, is more analogous to the instant case.  *See id.* at 5 (citing *Ulbricht v. Ternium S.A.*, No. 18-CV-6801, 2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020)).  According to 500.com, *Ulbricht* was overlooked by the court in *Tenaris*'s.  *Ulbricht* found that a code of conduct and ethics similar to 500.com's was not actionable.  *Id.* at 5 (citing *Ulbricht*, 2020 WL 5517313, at *5, 9).

As to the SOX certifications, 500.com maintains that such a certification only attests to what the certifying officer knows -- and Plaintiffs have not pled with particularity that either Defendant Pan or Yuan had any knowledge about the bribery scheme at the time the certifications were executed.  *See id.* at 7-8.  With respect to the statements made regarding the principal activities of Nihon, 500.com asserts that (a) the issue of whether any bribery took place was unadjudicated at the time these statements were made and (b) "[e]ven if the alleged bribery

activity by Nihon personnel occurred exactly as pled . . .  Plaintiff[s] do[] not allege that such bribery constitutes a 'substantive operation' that would render the challenged statements false." *Id.* at 12.  500.com then repeats its prior contentions concerning its risk disclosures and adds that, contrary to Plaintiffs' opposition, the SAC does not allege particular facts which show that at the time 500.com filed Form 20-Fs, the risks disclosed therein had materialized or had a negative impact. *See id.* at 9-11.

500.com then address Plaintiffs' arguments concerning scienter. *See id.* at 15-24.  First, 500.com argues that the allegations of Defendant Pan's scienter are insufficient because Plaintiffs have only identified "two wholly innocuous events that he claims demonstrate that Mr. Pan had "intense involvement" in 500.com's bid to run an Integrated Resort." *Id.* at 15-16. According to 500.com, the allegations of Xi's scienter are also insufficient because "the scienter of a subsidiary's executive cannot be imputed to the parent company." *Id.* at 19.  Given the absence of scienter for someone whose intent can be imputed to 500.com, 500.com argues that Plaintiffs have thus failed to plead scienter as to the company itself. *Id.* at 15.  Finally, 500.com claims that none of the remaining justifications which Plaintiffs have proffered give rise to any inference of scienter largely because they were not pled with particularity. *See id.* at 21-24.

### 2.    *Qiang Yuan's Motion to Dismiss*

#### a.    **Yuan's Memorandum of Law**

Defendant Yuan incorporates by reference the entirety of 500.com's motion to dismiss. *See* Defendant Qiang Yuan's Memorandum of Law in Support of Motion to Dismiss ("Def. Yuan's Mem.") [DE 47] at 1.  Yuan then presents several arguments unique to his motion which address Plaintiffs' second claim for violation of Section 20(a) of the Exchange Act. *See id.* at 1-3.  According to Yuan, this claim for control-person liability should be dismissed because

Plaintiffs have not alleged a primary violation of the Exchange Act by 500.com nor any conscious misbehavior or recklessness on Yuan's part.  *See id.*

### b.    Plaintiffs' Opposition

Similar to Defendant Yuan, Plaintiffs incorporate by reference the arguments they raised in opposition to 500.com's motion.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendant Qiang Yuan's Motion to Dismiss ("Pls.' Opp'n II") [DE 48] at 2.  For the reasons stated in that opposition, Plaintiffs argue that they have sufficiently alleged a primary violation of the Exchange Act by 500.com.  *See id.*  Because they alleged Yuan has served as 500.com's CFO since December 18, 2017 (during the time the alleged bribery scheme took place) and that he signed SOX certifications which stated that he designed and evaluated disclosure and internal controls over financial reporting and disclosed all fraud to 500.com's auditor, Plaintiffs contend that they have adequately demonstrated Yuan's culpable participation as necessary to plead a Section 20(a) violation.  *See id.* at 2-4.

### c.    Defendant Yuan's Reply

Defendant Yuan focuses on the allegations Plaintiffs honed in on regarding his "culpable participation" in a violation of the Exchange Act.  *See* Defendant Qiang Yuan's Reply Memorandum of Law in Further Support of His Motion to Dismiss ("Def. Yuan's Reply") [DE 49] at 2-4.  Yuan argues as a matter of law that Plaintiffs' "barebones" allegations -- which provide that he was the CFO of 500.com and signed SOX certifications -- are insufficient to allege the culpable participation necessary to plead a Section 20(a) claim.  *See id.*

## III.   STANDARDS OF REVIEW

### A.   Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  The plaintiff must satisfy "a flexible 'plausibility standard.'"  *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom.  Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555).

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which set forth a two-pronged approach to be utilized in analyzing a motion to dismiss.  District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679; *see also id.* at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).  Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.*

Second, if a complaint contains "well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged. The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556-

57) (internal citations omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts

alleged in the complaint, which are accepted as true; to documents attached to the complaint as

exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be

taken; or to documents whose terms and effect are relied upon heavily in the complaint and, thus,

are rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53

(2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).

### B.      Rule 9 and the Private Securities Litigation Reform Act

A plaintiff alleging securities fraud must also comply with the heightened pleading

requirements set forth in Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

*See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b). *Salim v. Mobile Telesystems PJSC*, No. 19-CV-

1589, 2021 WL 796088, at *6 (E.D.N.Y. Mar. 1, 2021); *see also ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("Securities fraud claims are subject to heightened

pleading requirements that the plaintiff must meet to survive a motion to dismiss. First, a

complaint alleging securities fraud must satisfy Rule 9(b)[] . . . . Second, private securities fraud

actions must also meet the PSLRA's pleading requirements or face dismissal."). Pursuant to

Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See* Fed. R. Civ. P. 9(b).  "To satisfy this requirement, the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  The PSLRA then expands upon Rule 9(b)'s standard.  *See id.*  "[A] securities fraud plaintiff must 'specify each misleading statement,' explain why the statement is misleading, and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *See Salim*, 2021 WL 796088, at *6 (quoting *Anschutz Corp.*, 690 F.3d at 108).

## IV.   DISCUSSION

### A.   Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act "makes it unlawful to 'use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations' that the SEC prescribes." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (quoting 15 U.S.C. § 78j).  Rule 10b-5, which was promulgated by the SEC, implements Section 10(b) and "prohibits 'mak[ing] any untrue statement of a material fact' or 'omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1100 (2019); *Tenaris*, 493 F. Supp. 3d at 156 (quoting 17 C.F.R. § 240.10b-5)).  "Section 10(b) claims are . . . subject to heightened pleading standards" under Rule 9 and the PLSRA.  *See Tenaris*, 493 F. Supp. 3d at 156.  "To bring a successful claim under Section 10(b) of the Exchange Act and Rule 10b–5, a plaintiff must

allege sufficient facts to establish that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Puda Coal Sec. Inc., Litig.*, 30 F.Supp.3d 261, 265–66 (S.D.N.Y. 2014) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)).  In their motions to dismiss, Defendants 500.com and Yuan focus their arguments solely on the contention that Plaintiffs have not satisfied the first two elements of a Section 10(b) claim.

### 1.    *Misstatements or Omissions of Material Fact*

"A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mucha v. Volkswagen Aktiengesellschaft*, -- F. Supp. 3d --, No. 17-CV-5092, 2021 WL 2006079, at *12 (E.D.N.Y. May 20, 2021) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).  If the complaint is based upon omissions, it must allege that "the corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F. Supp.2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

"Alleged misstatements or omissions must be material to be actionable.  'At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Mucha*, 2021 WL 2006079, at *12 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).  "An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell

shares of stock." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)). "Statements too general for a reasonable investor to rely upon are considered inactionable 'puffery' that cannot form the basis of a Section 10(b) securities fraud claim." *Mucha*, 2021 WL 2006079, at* 12 (citing *In re IBM Corp. Sec. Litig.*, 163 F.3d at 110).

An omission is actionable if the corporation is subject to a duty to disclose the omitted facts, "including when the omission relates to unlawful conduct." *Id.* (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231(1988)). "The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016)). "Additionally, where plaintiffs allege that a defendant's unlawful conduct renders a statement false or misleading, they must plead facts supporting the conclusion that the conduct, in fact, was unlawful." *Mucha*, 2021 WL 2006079, at * 12 (citing *Das v. Rio Tinto PLC*, 332 F. Supp.3d 786, 803 (S.D.N.Y. 2018)); *see also Tenaris*, 493 F. Supp. 3d at 157 ("Because the gravamen of the Amended Complaint is that a series of unlawful bribery schemes . . . rendered the challenged statements false or misleading, the Court must determine at the outset whether Plaintiff[s] [have] adequately alleged any or all of these bribery schemes." (quoting *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 631-32 (S.D.N.Y. 2017)). The unlawful conduct must also be pled with particularity. *See Tenaris*, 493 F. Supp. 3d at 157 (citing *In re Banco Bradesco*, 277 F. Supp. 3d at 632).

Plaintiffs' allegations of misleading statements or omissions here can be grouped into four categories: (1) statements regarding 500.com's Code of Business Conduct and Ethics; (2) Defendant Pan and Defendant Yuan's SOX certifications; (3) statements concerning Nihon's principal activity; and (4) the risk factors 500.com identified in its Item 3.D disclosures for the 2017 and 2018 Form 20-F filings. According to the Second Amended Complaint, each of these various statements was allegedly rendered false and misleading based on the Defendants' bribery scheme to secure a license to operate an integrated resort. Defendants, however, do not argue that Plaintiffs have failed to plead this bribery scheme with particularity. Therefore, the Court focuses its assessment of the sufficiency of Plaintiffs' allegations on the four types of statements identified above.

### a.    500.com's Code of Business Conduct and Ethics

Defendants challenge the Plaintiffs' allegations which claim that portions of 500.com's Code of Business Conduct and Ethics are misleading. *See* 500.com's Mem. at 10-12. Copies of 500.com's Code of Business Conduct and Ethics are attached to 500.com's 2017 and 2018 Form 20-F filings which were submitted by 500.com in support of its motion. *See* 2017 Form 20-F [DE 43-1] at 52; 2018 Form 20-F [DE 43-2] at 46. The Codes attached to each of these filings appear virtually identical and provide as follows:

> **INTRODUCTION**
> 500.com Limited. and its subsidiaries (collectively the "Company") are committed to conducting their business in accordance with all applicable laws and the highest standards of business ethics. This Code of Business Conduct and Ethics (the "Code") contains general guidelines for conducting the business of the Company. In general, employees should strive to comply with the law and conduct business honestly, fairly and in the best interests of the Company. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, we adhere to these higher standards.

This Code applies to all of the directors, officers, employees and advisors of the Company, whether they work for the Company on a full-time, part-time, consultative, or temporary basis. We refer to these persons as our "employees." We also refer to our Chief Executive Officer, Chief Financial Officer, our other executives and any other persons who perform similar functions for the Company as "executive officers." It is the Company's policy that any employee who violates this Code will be subject to discipline, which may include termination of employment. If your conduct as an employee of the Company does not comply with the law or with this Code, there may be serious, adverse consequences for both you and the Company.

**Seeking Help and Information**

This Code is not intended to be a comprehensive rulebook and cannot address every situation that you may face. If you feel uncomfortable about a situation or know of or suspect a violation of this Code, seek help. We encourage you to contact your supervisor first. If you do not feel comfortable contacting your supervisor, contact the compliance officer (the "Compliance Officer") of the Company, who shall be a person appointed by the Board of Directors of the Company (the "Board"). If you have any questions regarding the Code or would like to report any violation of the Code, please call or e-mail the Compliance Officer. Any questions or violations of the Code involving an executive officer should be directed or reported to any of the independent director on our Board or the members of the appropriate committee of our Board, and any such questions or violations will be reviewed directly by the Board or the appropriate committee of the Board.

**Reporting Violations of the Code**

Employees have a duty to report any known or suspected violation of this Code, including any violation of laws, rules, regulations or policies that apply to the Company. Reporting a known or suspected violation of this Code will not be considered an act of disloyalty, but an effort to safeguard the reputation and integrity of the Company and its employees.

. . .

**Waivers of the Code**

Waivers of this Code may be made only by the Board or the appropriate committee of the Board and will be promptly disclosed to the public as required by law or the rules of the New York Stock Exchange. Waivers of this Code will be granted on a case-by-case basis and only in extraordinary circumstances.

**COMPLIANCE WITH LAWS, REGULATIONS AND POLICIES**

Employees have an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. It is your responsibility to understand and comply with the laws, regulations and policies that are relevant to your position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Compliance Officer. Failure to comply with applicable laws and regulations can result in civil and criminal liability against you and the Company, as well as disciplinary action by the Company against you, including termination of employment. You should contact the Compliance Officer if you have any questions about the laws, regulations and policies that may apply to you.

**The Foreign Corrupt Practices Act**

The Foreign Corrupt Practices Act (the "FCPA") prohibits the Company and its employees and agents from offering or giving money or any other item of value to win or retain business or to influence any act or decision of any governmental official, political party, candidate for political office or official of a public international organization. The FCPA prohibits the payment of bribes, kickbacks or other inducements to foreign officials. This prohibition also extends to payments to a sales representative or agent if there is reason to believe that the payment will be used indirectly for a prohibited payment to foreign officials. Violation of the FCPA is a crime that can result in severe fines and criminal penalties, as well as disciplinary action by the Company, including termination of employment.

*See* 2017 Form 20-F [DE 43-1] at 52-53; 2018 Form 20-F [DE 43-2] at 46-47; *see also*

SAC ¶¶ 159, 169.

As noted, Defendants challenge Plaintiffs' contention that portions of this Code are

misleading.  Plaintiffs allege in the SAC that the Code was materially false, misleading or

omitted material because:  (1) 500.com was not committed to conducting its business in

accordance with "all applicable laws" because it authorized bribes to be paid in contravention of

the Code; (2) "500.com did not obligate its employees to comply with the laws covering bribery or kickbacks because Defendants knew about or recklessly disregarded the payment of bribes to government officials;" (3) 500.com and its executives engaged in bribery scheme which subjected the Company to criminal and civil exposure as well as reputational damage; (4) 500.com authorized and made multiple cash payments to public officials to secure illegal favors for its Japan casino bid; and (5) none of 500.com's employees obtained waivers to the Code. SAC ¶¶ 160, 170.  In the investment world, "[c]orporate codes of conduct tend to be 'general statements about reputation, integrity, and compliance with ethical norms [that] are inactionable puffery'—as opposed to being statements of facts—and are, therefore, generally incapable of forming the basis for a Section 10(b) claim." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (quoting *Singh*, 918 F.3d at 63)).  "This includes statements that are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *Id.* (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)).  Only in rare circumstances have courts permitted statements in a code of conduct to survive motions to dismiss, "holding that under the unique circumstances of the case, the statements could be viewed as material statements of fact."  *Id.* ("Examples of such rare circumstances include a company wielding its code of conduct to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance; statements that were detailed and sufficiently concrete that a reasonable investor could rely upon them; and statements that were so anathema to the alleged internal wrongdoing that, even if general or aspirational, they were materially false." (footnotes omitted)).

According to Defendants, 500.com's Code is aspirational and not capable of truth or falsity because there is no guarantee in the Code that 500.com's personnel always complied with

its terms.  *See* 500.com's Mem. at 10-11.  Defendants focus on the language of the Code which

states that employees "should strive to comply" with the law, "have an obligation to comply

with" the law, and are "expect[ed] . . . to adhere to the Code."  *See id.* at 11.  Moreover,

Defendants note that the Code "expressly raises the possibility of non-compliance and warns of

its consequences."  *Id.*; *see 2*017 Form 20-F [DE 43-1] at 52 ("If your conduct as an employee of

the Company does not comply with the law or with this Code, there may be serious, adverse

consequences for both you and the Company."); 2018 Form 20-F [DE 43-2] at 46 (same).  On

the other hand, Plaintiffs contend that the Code obligated directors, officers and employees to

comply with laws against bribery, kickbacks and foreign corrupt practices.  *See* Pls.' Opp'n I at

13.  Plaintiffs also maintain that 500.com's Code was "not forward looking and aspirational but

included specific assurances that 500.com 'adhere[d] to higher standards' than [what is]

'required by commercial practice or applicable laws' and required employees to obtain waivers

to stray from the Code."  *Id.*  In support of this argument, Plaintiffs cite *Tenaris* and claim the

court in that case "held actionable [a] nearly identical code of conduct."  *Id.* at 13-14 (citing

*Tenaris*, 2020 WL 6018919, at *2-3, *8).

　　　Plaintiffs' reliance upon *Tenaris* is misplaced.  The court in *Tenaris* analyzed both

Tenaris' code of ethics and code of conduct and found only the code of conduct to be actionable.

*See Tenaris*, 493 F. Supp. 3d at 158-60.  Tenaris' code of ethics stated that it "expects all of its

employees . . . to comply with applicable law, deter wrongdoing and to abide by [the] code of

conduct."  *Id.* at 158.  In holding that the code of ethics was not actionable, the court stated the

code was "but a generalized, aspirational statement about how Tenaris 'expects' its employees to

comport themselves.  It is not tethered to any context that would cause a reasonable investor to

interpret it as a specific assurance about how Tenaris conducts business.  And it contains no

representation of historical fact and makes no guarantee that it would never be broken." *Id.* at 159. On the other hand, the Tenaris code of conduct, which applied to executives, stated that the company will not "condone . . . the offering or receiving of bribes or any other form of improper payments." *Id.*

Tenaris executives paid bribes to Argentinian government officials to lobby Venezuela President Hugo Chavez against nationalizing the Venezuelan assets of a Tenaris subsidiary. *Id.* at 152-53. During the time Tenaris was bribing Venezuelan officials, Tenaris was also engaging in bribery in Uzbekistan. *Id.* at 153. With respect to the Uzbekistan scheme, the SEC and Tenaris entered into a deferred prosecution agreement ("DPA") which provided, among other things, for Tenaris to "annually review its corporate code of conduct; require senior directors and officers to annually certify compliance with the code of conduct; and, conduct anti-corruption compliance training." *Id.* The Tenaris code of conduct was held to be actionable for two reasons. First, its terms were material because the DPA required Tenaris to annually update and review the code and reasonable investors likely knew about the DPA due to an SEC press release and through Tenaris' 2013 Form 20-F. *Id.* at 159. The court found the DPA to increase the importance of the code to a reasonable investor because such a person who may have been reluctant to invest after the DPA would have their concerns alleviated by looking to the code's anti-bribery provision to evaluate Tenaris' commitment to conduct its business in accordance with the law and its efforts to police its own employees. *Id.* at 159-60. Second, the court in *Tenaris* found the code to be misleading by focusing on the language which states the company will not "condone" bribery. *Id.* at 160. The court defined "condone" as "[t]o regard or treat (something bad or blameworthy) as acceptable, forgivable, or harmless." *Id.* In light of the code's applicability to Tenaris' executives, the court found that a reasonable investor might

30

believe that Tenaris "does not accept or forgive any instance of bribery among its executives." *Id.* However, one of Tenaris' executives did engage in bribery and there was no indication that the executive faced any internal repercussions under the code. *Id.* For those reasons, the court in *Tenaris* deemed the code of conduct to be actionable because it was "not exclusively forward looking." *Id.*

To the extent Plaintiffs claim the language in Tenaris' code of conduct is "nearly identical" to 500.com's Code of Conduct and Ethics, the Court disagrees. In contrast to *Tenaris*, 500.com's Code is purely forward looking. 500.com's Code states that executives and employees "should strive" to comply with the law and are obligated to comply with the laws, rules, and regulations applicable to 500.com's operations. In particular, the Code provides that "[f]ailure to comply with applicable laws and regulations ***can*** result in civil and criminal liability against you and the Company, as well as disciplinary action by the Company against you, including termination of employment." *See* 2017 Form 20-F [DE 43-1] at 53 (emphasis added). Unlike *Tenaris*, 500.com's Code does not indicate that individuals who work for 500.com are guaranteed to face any internal repercussions for violating the Code's provisions. In addition, the specific factual circumstances which rendered Tenaris' code of conduct actionable, *i.e.*, the existence of a DPA, are not present in the instant case.

Moreover, the 20-F filings which contain 500.com's Code were filed with the SEC on April 27, 2018 and April 22, 2019. These filings were made well before the Japanese bribery scheme which underpins this entire case was even disclosed to the public and investors—which did not occur until December 2019. This fact is critical because only in rare circumstances have codes of conduct or ethics been held actionable -- and in the cases where they were, the statements contained in them were made in response to inquiries or challenges to the subject

company's conduct or ethics.  *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231

(S.D.N.Y. 2019) ("In the face of a credible accusation . . . that Signet suffered from rampant

sexual harassment . . . Defendants sought to reassure the investing public that Signet did

not . . . have a toxic workplace.  They did so by including representations in their periodic SEC

filings that the company expressly 'denies the allegations' . . . by pointing to their corporate

policies . . . affirming the company's commitment to making hiring decisions solely on the basis

of merit, disciplining misconduct in its ranks, and providing employees with a means to report

sexual harassment without fear of reprisal. And they did so by emphasizing that Signet's senior

executives held themselves to the highest standards of all." (internal citation omitted)); *Tenaris*,

493 F. Supp. 3d at 159-60 (holding code of conduct actionable which expects employees to

comply with applicable law and prohibits bribery where an SEC deferred prosecution agreement

required executives to certify compliance with its terms); *see also Ulbricht*, 2020 WL 5517313,

at *9 & n.6 (holding codes of conduct and ethics were not actionable because they were

generalized statements, did not guarantee compliance, made no historical representation that the

company's officers uniformly abided by the codes' rules, and included statements that were not

"made specifically in response to any particular inquiries regarding [the company's] ethics or

activities").

      "There is an important difference between a company's announcing rules forbidding

bribery and its factually representing that no officer has engaged in such forbidden conduct."

*Ulbricht*, 2020 WL 5517313, at *9 (quoting *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731,

756 (S.D.N.Y. 2017)); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360-

61 ("Although the Company's codes of ethics prohibit bribery and other forms of fraudulent

conduct, they do not claim that PetroChina's officers are abiding by them.  Since the SAC does

not challenge the actual existence of these rules, nor PetroChina's description of them, Plaintiffs

have not demonstrated that the Company's statements were false or misleading. (citing *In re*

*FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008))).

For these reasons, the Court finds that 500.com's Code of Business Conduct and Ethics is

not actionable and recommends dismissal of Plaintiffs' Section 10(b) claim to the extent it is

based upon statements contained within the Code.[6]

### b.    SOX Certifications

Plaintiffs principally allege that two aspects of the SOX certifications by Defendants Pan

and Yuan were misleading:  (1) internal controls were designed to ensure that material

information related to 500.com was timely made known to them; that such controls would

reasonably assure the reliability of financial reporting and statements in accord with generally

accepted accounting principles; and any changes to 500.com's internal control over financial

reporting were disclosed; and (2) that they disclosed to 500.com's auditors and board of directors

any significant deficiencies and material weaknesses in the internal control over financial

---

[6]    Plaintiffs filed a notice of supplemental authority on May 10, 2021 to bring to the Court's attention a recent decision issued by the U.S. District Court in the Northern District of Illinois. *See* Notice of Supplemental Authority [DE 52] (citing *Flynn v. Exelon Corp.*, No. 19-8209, 2021 WL 1561712 (N.D. Ill. April 21, 2021)).  Plaintiffs briefly argue that *Flynn*, which also involved a bribery scheme, bears on the issues of whether Defendants here were required to disclose the bribery scheme in Item 3.D and whether 500.com's Code of Conduct and Ethics is actionable. *Id.* at 2.  As an initial matter, a decision by the Northern District of Illinois is not binding upon this Court and need not be considered.  Nevertheless, the Court has reviewed *Flynn* and finds it to be distinguishable from the instant case for two reasons:  (1) *Flynn* does not specifically address what was required of the defendants in their Item 3.D disclosures; and (2) as noted by Defendants in their response to this notice of supplemental authority, the "code of conduct and guidelines" in *Flynn* "included affirmative and unqualified statements regarding the conduct of [the defendant's] employees, such as "[w]e never request, offer or accept any form of payment or incentive intended  to improperly influence a decision." *See Flynn*, 2021 WL 1561712, at *9; Defendants' Response to Notice of Supplemental Authority [DE 53].  500.com's Code of Conduct and Ethics does not contain such affirmative statements.  Thus, Plaintiffs' reliance on *Flynn* is not persuasive.

reporting as well as any fraud that involved management or other employees who have a significant role over 500.com's internal control.  *See* SAC ¶ 171.

In their opposition to 500.com's motion, Plaintiffs focus only on the aspect of the SOX certifications which state that Defendants Pan and Yuan disclosed any fraud to 500.com's auditor.  *See* Pls.' Opp'n I at 11-12.  As such, the Court finds that Plaintiffs abandoned any argument as to the allegedly misleading statements concerning the adequacy of the internal controls.  *See* 500.com's Reply at 7.  However, even if Plaintiffs did advance such an argument, "[c]ourts in this Circuit have rejected internal controls claims where the plaintiffs have similarly 'not pled any facts pertaining to defendants' internal structure for financial reporting, much less that defendants lacked adequate internal controls.'"  *See Ulbricht*, 2020 WL 5517313, at *10 (quoting *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017)).  Here, Plaintiffs have not alleged any facts regarding the structure of 500.com's internal controls. Consequently, "[t]o the extent Plaintiffs attempt to state a claim that the controls were demonstrably insufficient because the controls failed to catch the alleged bribery, that argument is legally foreclosed."  *Id.*; *see In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) ("[A]llegations that th[e] controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances, are not sufficient." (citations omitted)); *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) ("Plaintiffs rely solely on general assertions regarding the existence of deficient controls, which fall far short of satisfying the exacting pleading requirements of Rule 9(b) and the PSLRA.").

Turning to the remaining portions of the SOX certifications which Plaintiffs allege to be false (*i.e.*, that Pan and Yuan were aware that they did not disclose the bribery scheme to

500.com's auditor, *see* SAC ¶ 162), Defendants argue that these statements are not misleading because there are no allegations that the certifying officers had knowledge of the alleged wrongdoing, that Plaintiffs have not pleaded any fraud by 500.com's management or employees, and that SOX certifications do not require disclosure of unadjudicated allegations of bribery.  *See* 500.com's Mem. at 12-13; 500.com's Reply at 6-8.  Plaintiffs argue that the certifications are actionable and were misleading because "Pan was involved in the bribery scheme . . . [,] both Pan and Yuan were senior members of management with a significant role in the Company's internal controls[,] [and] [c]ontrary to their attestations that they disclosed any fraud to 500.com's auditor, Defendants hid the bribes from Friedman prompting it to resign and retract its audit reports."  *See* Pls.' Opp'n I at 11-12 (first citing *In re Lihua Int'l, Inc. Sec. Litig.*, No. 14-CV-5037, 2016 WL 1312104, at *10-11 (S.D.N.Y. Mar. 31, 2016); then citing *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532-33 (S.D.N.Y. 2009)).

In *Braskem*, the court analyzed SOX certifications which contained statements substantially similar to the certifications signed by Defendants Yuan and Pan here.  For example, the SOX certifications in *Braskem* provided that the Form 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  *See In re Braskem*, 246 F. Supp. 3d at 746.  Those SOX certifications further stated that the Form 20-F disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information [and . . .] *[a]ny fraud*, whether or not material, that involves management or other employees who have a significant role in the company's internal control

over financial reporting." *Id.* at 746-47 (alterations in original). Holding that the certifications were not actionable, the court in *Braskem* determined that "there [were] no concrete allegations in the SAC that made those statements false or misleading. Indeed, the SAC is devoid of *any* allegations indicative of undisclosed control deficiencies affecting [the company's] financial reporting." *Id.* at 757. *Braskem* did not specifically address the aspect of the SOX certification that pertained to the disclosure of "any fraud" after concluding that the plaintiffs failed to allege deficiencies in the company's internal controls.

In *Banco Bradesco*, which involved a similar SOX certification, the investor plaintiff challenged the portion of the company's certification which stated the certifying officer "disclosed . . . to the company's auditors and the audit committee of the company's board of directors . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." *See In re Banco Bradesco*, 277 F. Supp. 3d at 654. After having previously determined the plaintiff's allegations regarding internal controls were insufficient, the court in *Banco Bradesco* acknowledged that the statements at issue "could fairly be read to encompass only fraud that is related to [the internal controls over financial reporting]." *Id.* at 647-48, 654. In contrast to *Braskem*, the court in *Banco Bradesco* did not end its analysis there. *Id.* at 654. The court continued, noting the certification specifically referred to disclosures which needed to be made to the company's auditors or the audit committee. However, the plaintiff alleged only that the fraud was not disclosed to investors and made the assumption that the fraud was not conveyed to the auditors or audit committee. *Id.*

Unlike the *Banco Bradesco* investors, the Plaintiffs in the instant case did allege that Defendants Pan and Yuan failed to disclose the bribery scheme to 500.com's auditor.

Significantly, however, what Plaintiffs have failed to do is allege with any particularity that the individual Defendants knowingly concealed this information from 500.com's auditor. Plaintiffs rely upon *Sadia*, a decision where the court held that investors met their pleading burden regarding senior officers' failure to disclose "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." *In re Sadia*, 643 F. Supp. 2d at 532-33. Ruling in favor of the investors, the court in *Sadia* found that the complaint sufficiently alleged that the officers "knowingly concealed that the [c]ompany had entered into substantial high-risk currency hedging contracts in violation of its internal hedging policy." *Id.* at 533. Although *Sadia* does not describe the allegations which demonstrate that the officers had such knowledge, this Court has independently reviewed the amended complaint in *Sadia*. That amended complaint sets forth the hierarchy of senior management, the roles of executives and their access to information about the company's hedging practices, and a specific incident during which the company revealed its risk management committee was aware of its hedging exposure prior to such exposure being publicly disclosed. *See In re Sadia*, CV 08-9258, Amended Complaint [DE 25] at ¶¶ 37-57. Such specific factual allegations are lacking in the instant case.

The awareness or knowledge of the information the individual Defendants were in possession of at the time they allegedly failed to make a disclosure is critical to the Court's inquiry. On this particular issue -- which the Court notes is intertwined with whether scienter is adequately pled -- Plaintiffs argue that Defendants Pan and Yuan were senior members of management with a significant role in 500.com's controls and that Defendant Pan himself was involved in the bribery scheme. *See* Pls.' Opp'n at 11-12. Plaintiffs' first argument is easily disposed of since it is well-established that plaintiffs "must do more than allege that the

individual defendants . . . or other officers had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for monitoring [their company's] activities, and their access to inside information. *Johnson v. Siemens AG*, No. 09-CV-5310, 2011 WL 1304267, at *15 (E.D.N.Y. Mar. 31, 2011) (citing *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204-05 (E.D.N.Y. 2011)).  With respect to Pan's involvement in the bribery scheme, Plaintiffs' allegations are too speculative to demonstrate he was involved in the scheme or even aware of it at the time the SOX certifications were written.  There is but one general allegation in Plaintiffs' 56-page, 218 paragraph-long Second Amended Complaint which states that bribes were delivered to Akimoto (the Japan government official who was eventually arrested) at the direction of Defendant Pan.  *See* SAC ¶ 10.  Moreover, Plaintiffs' allegations which speak to Defendant Pan's knowledge of or involvement in the bribery scheme are dubious and circumstantial.  For example, Plaintiffs allege that Pan spoke at a 500.com symposium at which Akimoto was the keynote speaker.  *Id.* ¶¶ 78-79.  In addition, Plaintiffs allege that Pan -- along with other top 500.com executives -- met with officials in Rusutu Village in Japan about a proposal to obtain an IR license and one month later, Akimoto visited Rusutu to express that the Japanese central government supported 500.com's plans to build an IR.  *Id.* ¶¶ 86-87.[7]  Unfortunately, Plaintiffs have not connected the dots here, and the Court is left to assess what amounts to innuendo.

For these reasons, the Court finds that Plaintiffs have not adequately alleged that Defendant Pan had actual knowledge of the alleged bribery.  As a result, the Court cannot infer

---

[7]     The Court notes that there are allegations which state that two of the individuals arrested admitted to Tokyo prosecutors that they delivered bribes at the direction of 500.com.  *Id.* ¶¶ 52-53.  Again, however, these allegations do not indicate that it was Defendant Pan who gave such an order.

or conclude that Pan knew his SOX certifications were false.  *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) [*Menaldi II*] ("But while signing the SOX certifications might be indicative of scienter, the New Complaint does not state a standalone claim based on the SOX certifications. . . .  To the extent that [the Complaint] alleges that Och and Frank misrepresented their knowledge of the then-uncharged conduct, the Court has likewise held that there was no affirmative duty to disclose that conduct. . . .  And since, as discussed above, the New Complaint does not adequately allege that Och and Frank had actual knowledge of the bribery, it undermines the allegations that they knew that the SOX certifications were false.").

Accordingly, the Court recommends to Judge Brown that Plaintiffs' Section 10(b) claim -- to the extent it is based upon statements contained within the individual Defendants' SOX certifications -- be dismissed.

### c.    Statements Concerning Nihon's Principal Activity

Plaintiffs allege Defendants made false and misleading statements in 500.com's 2017 and 2018 Form 20-F filings regarding the principal activity of 500.com's subsidiary, Nihon. According to the SAC, the filings stated that Nihon's principal activity was investment holding and that it had no substantive operations.  *See* SAC ¶¶ 29, 163.  According to the Plaintiffs, this assertion is false and misleading because Defendants omitted the fact that "Nihon's substantive operations included an illegal bribery scheme designed to obtain preferable treatment in connection with [a] bid to run an Integrated Resort."  *Id.* ¶ 164.

500.com argues that Plaintiff's challenge to Defendants' description of Nihon's operations must fail for three reasons:  (1) 500.com was not required to accuse itself of unadjudicated wrongdoing, even if it knew of such wrongdoing at the time the 20-Fs were filed; (2) there are no

allegations that Nihon ever actually had any revenues or business; and (3) the alleged bribery scheme does not constitute a "substantive operation" which would render the description false. *See* Def. 500.com's Mem. at 15-16; Def. 500.com's Reply at 12-13.  On the other hand, Plaintiffs claim that although Defendants did not have a duty to discuss Nihon's activities, they nonetheless did so and, as a result, became obligated "to tell the whole truth" and disclose the bribery scheme.  *See* Pl.'s Opp'n I at 16.

Generally, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  *In re Banco Bradesco*, 277 F. Supp. 3d at 600 (quoting *City of Pontiac*, 752 F.3d at 184); *see also Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16 CIV. 6277, 2018 WL 1725574, at *5 (S.D.N.Y. Mar. 30, 2018) ("The controlling principle is that 'disclosure is not a right of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.'") (quoting *City of Pontiac*, 752 F.3d at 184)).  However, a duty to disclose uncharged wrongdoing may arise if the company's statements are or become materially misleading in the absence of disclosure.  *In re VEON Ltd. Sec. Litig.*, No. 15-CV-8672, 2017 WL 4162342, at *5 (S.D.N.Y. Sept. 19, 2017) (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005)).  "[T]here must be a connection between the illegal conduct and the misleading statements 'beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line.'" *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LL*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) [*Menaldi I*] (quoting *In re FBR*, 544 F. Supp. 2d at 357).

District courts have found the existence of a duty to disclose uncharged wrongdoing in three circumstances:  (1) where a corporation puts its success at issue but "fails to disclose that a material source of its success is the use of improper or illegal business practices;" (2) when a

defendant "makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring;" and (3) "when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *Id.* (first citing *In re FBR*, 544 F. Supp. 2d at 357-58; then citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-90 (2015))

The Court agrees that Defendants were not required to disclose the bribery scheme at the time statements were made concerning Nihon's principal activity because the Plaintiffs have not alleged nor argued the existence of any of the three circumstances set forth above by *Menaldi I* which would give rise to such a duty. In particular Plaintiffs have not alleged that the sources of 500.com's success are attributable to any actions taken by Nihon or that 500.com denied the occurrence of illegal conduct. Nor have the Plaintiffs asserted that Defendants proffered any opinion which could mislead investors about material facts. Moreover, courts have not required defendants in cases such as this to disclose uncharged criminal wrongdoing even ***after*** the defendants became subject to scrutiny by regulatory agencies or other proceedings related to the conduct at issue. *See City of Pontiac*, 752 F.3d at 178-84; *Embraer*, 2018 WL 1725574, at *4-6; *In re Banco Bradesco*, 277 F. Supp. 3d at 650-54; *Menaldi I*, 164 F. Supp. 3d at 581. For example, in *City of Pontiac*, the plaintiffs alleged that the corporate defendant failed to disclose uncharged criminal conduct which was being investigated by the Department of Justice. *See City of Pontiac*, 752 F.3d at 184. The *Pontiac* plaintiffs argued that the defendants were required not only to disclose the existence of the DOJ's investigation, but they also were obligated to disclose that they were engaged in an ongoing tax evasion scheme. *Id.* The Second Circuit found the defendants had complied with this disclosure obligations because public statements were made regarding the substantial risks the DOJ's investigation posed. *Id.*

41

Plaintiffs here do not allege nor argue that Defendants made any false or misleading statements or omissions in disclosures issued after arrests were made relating to the bribery scheme. As such, Plaintiffs are challenging statements which were made by Defendants well before 500.com first came under scrutiny for paying bribes. The Court declines to expand the duty for a corporation to disclose uncharged wrongdoing under these circumstances. As such, the Court recommends that Plaintiffs' Section 10(b) claim be dismissed to the extent it relies upon statements concerning the principal activity of Nihon.

### d.    Risk Disclosures

Plaintiffs allege that the risk factors 500.com identified in its Item 3.D disclosures were incomplete and materially misleading because Defendants omitted stating the risks which would stem from the payment of illegal bribes such as civil and criminal liability, fines, penalties, loss of investor confidence, and a decline in 500.com's stock price. *See* SAC ¶ 167. Defendants argue the risk disclosures were made in April 2018 and April 2019 -- well before legal proceedings in the Japanese bribery scheme commenced in December 2019 -- and that they did not have a duty to disclose risks associated with an uncharged, unadjudicated wrongdoing. *Id.* at 13-14. Plaintiffs' Opposition does not follow the allegations in the SAC and appears to assert that 500.com's risk disclosures were misleading for an entirely different reason. *See* Pls.' Opp'n I at 17. Plaintiffs argue that 500.com's risk disclosures stated its casinos "require various approvals, licenses and permits to conduct their business" and warned it "cannot assure that these providers will not encounter significant problems in obtaining new or renewing existing approvals." *Id.* Plaintiffs then submit that these risks were not hypothetical at the time they were made, but had already materialized because 500.com experienced difficulties obtaining new

business after online gambling was banned in China and the company resorted to paying bribes to Japanese government officials to obtain an IR license. *Id.* at 17-18.

For the reasons set forth in Section IV.A.1.c *supra*, the Court has already determined that Defendants did not have a duty to disclose the uncharged wrongdoing of the bribe payments at the time the Form 20-Fs were filed and the subject risk disclosures were made. The general rule that a company does not have such a duty "would be entirely meaningless if every reporting company were required to disclose uncharged, unadjudicated conduct in the risk-factors sections of its filings." *In re Banco Bradesco*, 277 F. Supp. 3d at 650-51. Consequently, the Court does not find 500.com's risk disclosures to be actionable on the basis that they should have disclosed the risks associated with paying bribes. *See id.* at 651 ("[T]he Court declines to read Item 3.D to affirmatively require disclosure of uncharged illegal conduct in all instances."); *see also Ulbricht*, 2020 WL 5517313, at *9-10 (finding the plaintiffs did not allege actionable misrepresentations in Item 3.D risk disclosures based upon the omission of a bribery scheme).

Plaintiffs' Opposition sets forth a theory of liability based upon 500.com's risk disclosures – a theory which was not asserted in the SAC. "[I]t is well settled that '[p]laintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to [d]efendants' motion to dismiss.'" *Hurley v. Town of Southampton*, No. CV 17-5543, 2018 WL 3941944, at *18 (E.D.N.Y. Aug. 13, 2018) (quoting *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013)); *see Williams v. Black Entm't Television, Inc.*, No. 13-CV-1459, 2014 WL 585419, at *11 (E.D.N.Y. Feb. 14, 2014) ("Plaintiff cannot amend his pleadings through an opposition brief."); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is longstanding precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.").

Although the Court could decline to consider Plaintiffs' argument that the risk disclosures were misleading because 500.com was already experiencing difficulties obtaining new licenses at the time the risk disclosures were filed, this argument also fails. *See Ulbricht*, 2020 WL 5517313, at *9-10 ("Here, the Amended Complaint does not allege that harm to Ternium's business had already occurred at the time of the Class Period disclosures, but simply that the risk factors . . . that could give (and later did) give rise to such harm—*i.e.*, the drop in Ternium's stock prices in 2018 following the revelations from [a wide-ranging bribery investigation—were already in play.").  The SAC is clear that Plaintiffs and other members of the class suffered economic loss when the price of 500.com's shares dropped "***once the truth regarding [500.com's] bribers were revealed to the market***."  *See* SAC ¶ 189 (emphasis added).  These harms did not begin to occur until December 2019 at the earliest, which is well after the risk disclosures were filed.

Accordingly, the Court recommends to Judge Brown that Plaintiffs' claims, to the extent they are based upon misstatements or omissions in Defendants' Item 3.D. risk disclosures, be dismissed.  *See Ulbricht*, 2020 WL 5517313, at *9-10; *In re Banco Bradesco*, 277 F. Supp. 3d at 650-51.

### B.    Section 20(a)

Plaintiffs' remaining claims are against the individual Defendants Pan and Yuan which are brought pursuant to Section 20(a) of the Exchange Act.  Section 20(a) imposes liability on individuals who control any person or entity that violates Section 10(b).  *See* 15 U.S.C. § 78t(a). "To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud

perpetrated by the controlled person.'" *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015) (quoting *Bd. of Trustees of City of Ft. Lauderdale Gen Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011)); *see also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 253 (S.D.N.Y. 2018) ("A claim for control person liability under Section 20(a) is 'necessarily predicated on a primary violation of securities law.'" (quoting *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004))); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014) ("It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation."). Thus, in light of the fact that the Court has already determined that Plaintiffs failed to allege a primary violation under Section 10(b), Plaintiffs' claims arising under Section 20(a) should be dismissed as well.

### C.    Claims Against Defendant Pan

Defendant Pan did not join in either 500.com's motion or Defendant Yuan's motion. Pan has not appeared in this case. However, the Plaintiffs have not filed an affidavit confirming that Defendant Pan was served with copies of the summons or any of the operative pleadings in this matter. Pursuant to Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. Fed. R. Civ. P. 4(m).

This case was commenced on February 13, 2020. *See generally* Compl. Summonses were issued on February 18, 2020. *See* DE 8. Service should have been effectuated upon Defendant Pan by May 13, 2020, which is 90 days after the Complaint was filed. The Amended

Complaint was filed on June 25, 2020 and new summonses were issued on July 2, 2020.  *See*

*generally* Am. Compl; DE 28.  No proof of service of either the Amended Complaint and its

corresponding summons upon Defendant Pan were provided.  Lastly, the Second Amended

Complaint was filed on November 20, 2020.  *See generally* SAC.  No further summonses were

issued nor is there any indication the SAC was served on Defendant Pan.  Although sufficient

grounds exist to dismiss Plaintiffs' claims against Defendant Pan due to their failure to serve

him, Plaintiffs' claims against him should be dismissed for the same reasons the claims against

500.com and Defendant Yuan fail.  *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769

F.Supp.2d 478, 499 (S.D.N.Y.2011), *aff'd sub nom.*, *Alki Partners, L.P. v. Windhorst*, 472

Fed. App'x 7 (2d Cir.2012) (dismissing Section 10(b) and 20(a) claims against an individual

defendant who did not appear in the case or join in the other defendants' motions because the

plaintiffs' claims against him failed for the same reasons they failed against the other

defendants).

　　A district court "has the power to dismiss a complaint against [a] non-moving Individual

Defendant[], so long as it is exercised cautiously and on notice."  *In re PetroChina*, 120 F. Supp.

3d at 369 (citing *Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994)).  Both of the

motions filed by 500.com and Defendant Yuan put Plaintiffs on notice of the grounds for

dismissal of the claims against Defendant Pan because the arguments raised in those motions are

also applicable to him -- and Plaintiffs were afforded an opportunity to oppose both motions.

Plaintiffs have not established any actionable false or misleading statements, *see supra* Part

IV.A., and, consequently, are unable to allege any claims for control liability, *see supra* Part

IV.B.  Accordingly, the Court recommends that Plaintiffs' claims against the non-moving

Defendant Pan be dismissed because Plaintiffs not only failed to serve him, but because the

claims against him fail due to the same deficiencies in the Plaintiffs' claims against 500.com and Defendant Yuan. *In re PetroChina*, 120 F. Supp. 3d at 368-69; *Alki Partners*, 769 F. Supp. 2d at 499.

### D.     Leave to Amend

In a single sentence in the concluding paragraph of Plaintiffs' opposition to 500.com's motion, Plaintiffs request an opportunity to replead in the event the motion to dismiss is granted in whole or in part. *See* Pls.' Opp'n I at 26. Rule 15(a) of the Federal Rules of Civil Procedure provides that in cases where a party cannot amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P. 15(a); *DaCosta v. City of New York*, No. 15-CV-5174, 2017 WL 5176409, at *8 (E.D.N.Y. Nov. 8, 2017), *reconsideration denied sub nom. DaCosta v. Tranchina*, 285 F. Supp. 3d 566 (E.D.N.Y. 2018). Whether to grant leave to amend is a decision squarely within the district court's discretion. *Krupski v. Costa Crociere S. p. A.*, 130 S.Ct. 2485, 2489 (2010) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)) (Rule 15(a) "gives a district court discretion to decide whether to grant a motion to amend a pleading before trial.").

The Court points out that Plaintiffs' request for leave to amend is procedurally defective because, among other things, it is not accompanied by a proposed amended pleading nor does it provide any explanation as to the contents of the proposed amendments. However, the Court is aware of decisions where plaintiffs have been granted leave to amend in securities cases like this—even where such a request is made "albeit in a cursory [sentence] at the end of their response brief." *See Ulbricht*, 2020 WL 5517313, at *12 (noting that although the plaintiffs "have not specified how they would amend their pleading if granted leave to do so, the Second Circuit has admonished district courts that 'complaints dismissed under Rule 9(b) are almost

47

always dismissed with leave to amend.'" (quoting *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296-97 (S.D.N.Y. 2019))).

Notwithstanding that premise, Plaintiffs have an uphill battle here in terms of curing the defects identified in this Report and Recommendation. The Court reserves to Judge Brown the issue of a third amended pleading.

## V.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Brown that: (1) Defendant 500.com's motion to dismiss be GRANTED; (2) Defendant Yuan's motion to dismiss be GRANTED; and (3) the claims against Defendant Pan be dismissed *sua sponte.*

## VI.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See* FED. R. CIV. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Gary R. Brown. Any requests for an extension of time for filing objections must be directed to Judge Brown prior to the expiration of the fourteen (14) day period for filing objections**. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

<b>SO ORDERED.</b>

Dated: Central Islip, New York
      August 13, 2021

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge